## PHŒNIX INSURANCE CO. *v.* HAMILTON & CO.

This case is controlled by the decision of this court in *Ramspeck* v. *Pattillo*, 104 *Ga.* 772, wherein it was expressly ruled that "An agent of a fire-insurance company, authorized to contract for insurance in its behalf, can not, without the company's consent, become in his individual character the agent of a property-owner who desires to obtain insurance in that company, . . . for the reason that an agreement to act as agent for both parties would be an undertaking to perform inconsistent duties, and a mutual agency of this kind requires the consent of both parties."

Argued November 4, 1899. — Decided February 28, 1900.

Action on insurance policy. Before Judge Littlejohn. Dooly superior court. February term, 1899.

*Anderson, Anderson & Grace,* for plaintiff in error.
*Thomson & Whipple,* contra.

FISH, J. This was a suit upon a policy of fire-insurance, brought by W. C. Hamilton & Co. against the Phœnix Insurance Company of Hartford, Conn. The case as made out at the trial by testimony offered in behalf of the plaintiff was, in brief,

as follows: In 1897 the defendant corporation and a number of other insurance companies were represented by Cobb Bros., of Cordele, Ga., as general agents. At the solicitation of a member of that firm, W. C. Hamilton consented to take out insurance to the amount of $1,500 on certain buildings located at Seville. The premium agreed upon was $121, of which $50 was to be paid in cash and the balance at stipulated periods in the future. Hamilton, on being asked if he had any choice as to the company with which the insurance should be placed, replied that he was willing to leave that matter entirely with the agent. The latter agreed that "if one company turned it down, he would put it in another until he exhausted all the companies he had." In the event the company with which the risk was placed subsequently canceled its policy, he was to place the insurance with another of his own selection, it being stipulated that he was to keep Hamilton "perfectly insured for fifteen hundred dollars" in consideration of the amount of premium agreed upon. In this connection, Hamilton testified as a witness: The agent "mentioned several of his companies, and he told me that he would write me, and if it didn't stick he would continue writing me until he exhausted all of his companies." In other words, it would seem that the agreement was that the agent undertook to keep the insurance in force, reinsuring the property as often as might be necessary, in the event some of the companies he represented declined to carry the risk, it being contemplated between the parties that, to this extent, he should act in behalf and as the representative of Hamilton. In pursuance of this understanding, the agent thereafter issued to Hamilton two policies for $750 each, one in the Orient Insurance Company and the other in the New York Home. A few days later, the agent sent by mail to Hamilton a policy for $750 in the Atlanta Home Insurance Company, to take the place of that issued in behalf of the New York Home, explaining that the latter company had ordered him to cancel its policy, and requesting Hamilton to return the same to him. This request was duly complied with, Hamilton recognizing the agent's authority under their agreement to make such a substitution of policies. Shortly thereafter, on December 24, 1897, Cobb Bros. ad-

dressed a letter to the plaintiff's firm, in which they said: "We herewith enclose to you a policy in the Phœnix of Hartford, to take the place of the one you now have in the Atlanta Home, on your property at· Seville, and will ask you to kindly return the Atlanta Home policy, as the company does not write saloons and requested the cancellation of policy. Trusting that this will be the last time we will have to trouble you· with the matter, we remain," etc.    This letter, together with the enclosure therein referred to, was received by Hamilton on Sunday evening, December 26th, on his return home from a journey.    At 2 o'clock on the morning of that day, the property insured had been totally destroyed by fire.    On the following day, Cobb, the agent mentioned above, visited Seville, and Hamilton surrendered to him the policy in the Atlanta Home, retaining that issued in the name of the Phœnix which had been sent by mail as a substitute.    On receiving the policies originally issued to him, Hamilton had duly made a cash payment of $50 and subsequently met his obligation to Cobb Bros. to pay them the balance of the premium of $121.    No part of the unearned premium was returned to him when the policy in the New York Home was cancelled at the direction of that company, nor was he given notice of its election to cancel the same before the policy designed to take its place was issued by Cobb Bros.    On the contrary, this substitution was made agreeably to the understanding above alluded to, that "if one policy didn't stick, Mr. Cobb was to attend to that for" the insured. Prior to the issuance of the policy in the Phœnix, Hamilton had not been notified of the desire of the Atlanta Home to cancel its policy, nor had Cobb Bros. returned any part of the unearned premium to him.    It was evidently contemplated that he should accept without question the substitution thus made, and he as matter of fact acquiesced therein upon being informed that Cobb had, prior to the fire, substituted the Phœnix policy for that held in the Atlanta Home, on his own motion, in accordance with the arrangement whereby he undertook to act as agent for the insured in keeping his property covered by insurance to the amount of $1,500.    Touching this matter Hamilton testified, in response to the question, "What power

did Cobb have from you in reference to the exchange of policies, if that should come up?": "Well, just any change he made was satisfactory to me. I had instructed him to keep me insured in good companies, and he said he would if it exhausted his companies; he said, if one company turned it down, he would keep writing it till he exhausted all his companies."

The question upon which this case necessarily turns is, therefore, whether or not this arrangement was one which the insured was at liberty to make with the agent of the defendant company without its knowledge, sanction or approval. Counsel for the company contend that the practical effect thereof was to constitute Cobb Bros. the agents both of the insurer and the insured in respect to a matter as to which there was a conflict of interest between them, and accordingly, that this case falls within the principle announced in *Ramspeck* v. *Pattillo,* 104 *Ga.* 772, "that an agreement to act as agent for both parties would be an undertaking to perform inconsistent duties, and a mutual agency of this kind requires the consent of both parties." It was in that case expressly ruled that "An agent of a fire-insurance company, authorized to contract for insurance in its behalf, can not, without the company's consent, become in his individual character the agent of a property-owner who desires to obtain insurance in that company." Applying this rule to the facts then under consideration, which were quite similar to those appearing in the case at bar, Chief Justice Simmons said (page 775): "The insurance company, having appointed Pattillo its agent, was entitled to his services and his best judgment and discretion in issuing policies upon property. It relied upon him entirely to select property on which was the least risk of fire and to properly classify the risks. It was to Ramspeck's interest to have his property insured, whether the risk was small or great. If Pattillo made this contract with Ramspeck, his duties were certainly conflicting. He could not be faithful to the interests of the company, procuring for it the best risks, and be at the same time faithful to Ramspeck by insuring his property though the risk might be undesirable to the company. The law will not permit an agent to assume such conflicting duties, and declares that such

contracts are against public policy." In support of this position, *Croghan* v. *N. Y. Underwriters' Agency,* 53 *Ga.* 109, in which McCay, J., employed substantially the same reasoning, was cited approvingly, and a number of adjudications to the same effect, rendered in other jurisdictions, were also referred to. After a careful consideration of these authorities, we can not escape the conclusion that the agreement upon which the plaintiff in the present case relied is open to the objection urged against it by the defendant. In its defense, counsel for the insured suggest, in a written argument filed in behalf of their client, that: "The authority which Hamilton gave Cobb Bros., to accept notice of cancellation for him, works directly to the benefit of the insurance company." Counsel seem to ignore the fact, however, that such authority was coupled with the condition that Cobb Bros. should immediately issue another policy in a different company, thus at all times keeping the property fully insured. To a company desiring to immediately recall a policy issued by it, the authority given to Cobb Bros. by Hamilton to at once cancel the same without consulting him would certainly operate to its direct advantage. But the company immediately taking its place would be the sufferer, if the risk was one which was quite hazardous and undesirable, which must necessarily be assumed in order to lay a foundation for the argument that the privilege of becoming relieved from liability without the usual delay was one of substantial benefit to the company electing to cancel its policy. Taken as a whole, therefore, the arrangement which Hamilton made with Cobb Bros., while perhaps advantageous to the Atlanta Home company in that it was thereby enabled to clear its skirts before the fire occurred, which it otherwise would not have been able to do, undoubtedly was calculated to operate to the prejudice of the Phœnix or such other company represented by Cobb Bros. as they might select as a substitute, they being bound under their agreement with Hamilton to immediately transfer the liability to the shoulders of some other company represented by them, irrespective of the question whether, at that time, they still considered the risk a desirable one for such company to assume.

It appears from the record before us that Cobb Bros. had a direct interest at stake, for they were to retain, by way of commissions, a given proportion of the premium paid by Hamilton as compensation for their services in writing the insurance. It does not appear that they had authority from their principals to extend credit to customers, and their contract with Hamilton whereby he was given time for payment was upon their individual responsibility and made with a view to securing business which they would not otherwise have been given, and receiving commissions thereon. It may very frankly be conceded that there is nothing in the record to suggest that Cobb Bros. did not, when they applied for this business, honestly and firmly believe the risk was one they could in good faith accept in behalf of any of the companies they represented which wrote insurance upon that class of property. But the vice of the agreement into which they entered was, that in the event the companies they originally selected subsequently deemed it to their interest to cancel their policies, Cobb Bros. were irrevocably bound, under the terms of such agreement, to at once reinsure in other companies, notwithstanding there had developed urgent reasons, unknown in the first instance, why the risk should have been declined and never written, and also regardless of the question whether or not there had been any change in the character of the risk originally recommended, such as to make the same extra-hazardous and no longer desirable. In other words, the companies who were to take the place of those in the first instance assuming the risk had undoubtedly a right to the untrammeled and uninfluenced judgment and discretion of Cobb Bros., their duly-appointed agents, as to the advisability *at that particular time,* of accepting a risk which other insurance companies had seen fit to decline further to assume, presumably for highly satisfactory reasons. Cobb Bros. could not, consistently with their duty to their principals, undertake in advance, and possibly under entirely different circumstances and conditions, to intelligently, faithfully, and conscientiously pass upon this all-important matter. Indeed, if the agreement into which they entered with Hamilton were legally binding upon them, they would be in duty bound to him to keep on reinsuring his property al-

though they may in the meantime have become fully convinced that they had made in the first place a great mistake in concluding the risk a safe and desirable one to carry, or may have learned that since their first inspection of the property such a change in the risk had occurred as to make it their imperative duty to the insurance companies they represented to positively decline to even entertain the idea of granting further insurance to Hamilton. The rule of law which was invoked by the defendant insurance company in the case at bar is designed to prevent just such an emergency, which can not possibly arise if the agent of one contracting party is not permitted to assume obligations to the other which are inconsistent with the duty such agent owes to his principal. We have accordingly reached the conclusion that, under the facts relied on by the plaintiff below, a recovery against the insurance company was unwarranted, it having interposed the special defense that a mutual agency of the character disclosed by the evidence in this case was against public policy, and therefore it was not legally bound by the act of its agent in undertaking to make in its behalf the contract declared upon.

*Judgment reversed. All the Justices concurring.*