## 487.  TODD *v.* GERMAN AMERICAN INSURANCE COMPANY OF NEW YORK.

1. A completed contract of insurance exists when the minds of the insurer and of the person to be insured meet upon the essential elements, to wit: the subject-matter to which the policy should attach; the risk insured against; the duration of the risk; the amount of the indemnity; the premium to be paid; subject to the limitation that by statute in this State the policy must be written, though not necessarily delivered. All these essentials need not, however, be expressly negotiated upon, but may be understood from custom, course of dealing, or other circumstances from which assent to them may fairly be implied.

2. It is error to nonsuit the plaintiff in an action upon a fire-insurance policy, on the ground that no completed contract of insurance is shown, where it appears that the plaintiff directed an insurance agency, in which the defendant company as well as other insurers was represented, to carry for him, on the property subsequently burned, a certain amount of insurance; that policies to the amount specified were written in different companies, chosen by the agency; that, upon one of these companies becoming bankrupt, the agency replaced the portion of insurance which was carried by that company, by writing a policy of similar amount in the defendant company; notwithstanding it further appears, that the plaintiff did not know of the substitution of policies until after the fire occurred, and although the new policy was never actually delivered to him.

   (*a*) The adjudication that a fire-insurance company is insolvent ipso facto cancels all existing policies upon which no loss has previously occurred.

   (*b*) From a general instruction by a customer to an insurance agency, that it shall keep certain specified property of his insured in a designated amount, his assent may be implied so as to give mutuality to a contract of insurance, in usual form, and upon the usual premium, written by that agency to replace a policy which has become cancelled by the insolvency of the company originally insuring.

3. If one, though not duly authorized, assumes to act as agent for another, and in the name of the latter procures a fire-insurance policy on his property which is subsequently burned, the person in whose name the policy has been issued may, upon discovery of the facts, ratify the assumed agency and assert liability against the insurer, to the same extent he could have done if his authority had been originally conferred upon the person who undertook to act as his agent.

   (*a*) While, as a general rule, public policy forbids dual agencies, and therefore forbids that the same person shall act as the agent of both the insurer and the insured, still this general rule is subject to many just exceptions.

   (*b*) If an insurance company, knowing or from the surrounding circumstances being reasonably aware that its local agent is acting or assuming to act for the customers of his agency in applying for policies of insurance in their names on their property, and without depending on

the skill, advice, or loyalty of the agent in the transaction, but acting upon its own judgment as to the desirability of the particular risks, authorizes the agent to write the policies, it will not be allowed to complain that such local agent was also the agent of the opposite parties to the contracts, but it will be held bound on the policies so written.

(c) "The maxim that 'no man shall serve two masters' does not prevent the same person from acting as agent, for certain purposes, of two or more parties to the same transaction when their interests do not conflict, and where loyalty to the one is not a breach of duty to the other."

4. "It is relevant to put in evidence any circumstances which tend to make the propositions at issue either more or less probable." 1 Whart. Evidence, §21.

5. "It is well settled that insurers are bound to know the customs of a place where they transact business; and are assumed to have made their contracts in reference to such customs."

Action on insurance policies, from city court of Macon—Judge Hodges. March 29, 1907.

Argued October 15,—Decided November 11, 1907.

Todd sued the German American Insurance Company of New York on two policies of insurance for the sum of $2,000 each. The court, at the conclusion of the plaintiff's testimony, awarded a nonsuit, and the plaintiff brings error. We shall report only so much of the evidence as is necessary to the understanding of the points decided. Todd purchased a stock of goods in Macon from the Dixie Company. This company was carrying insurance in several agencies, among which was that of Turpin. Todd caused some of the policies which had been carried by the Dixie Company to be cancelled; others to be transferred. Of the insurance through the Turpin agency Todd requested that $6,000 be transferred and the remainder cancelled. Todd testified, "I told Mr. Turpin at the time to keep me insured for $6,000, and I might give him more later. . . . I thought Mr. Turpin had $6,000. I didn't know what companies. I told the agent to keep me insured for so much, and I thought I had that much." On June 6, 1906, the stock of goods was destroyed by fire. Todd had never examined any of the policies, and did not know the names of any of the companies until after the fire occurred. Upon examining the policies written through the Turpin agency, he found a $2,000 policy of the Orient Insurance Company and two $2,000 policies of the Traders' Insurance Company. Upon discovering that the Traders' Insurance Company had failed, he went

to Turpin and inquired of him whether these two policies had been rewritten. Turpin then told him that he had rewritten these two policies in the German American Insurance Company and that he had the German American policies in his vault. Todd inquired if he owed any further premium; and Turpin replied that he did not, that he (Turpin) at his own expense had reinsured all his Traders' business. Todd did not demand the policies at the time; and subsequently, upon instructions from the general agent of the insurance company, Turpin refused to deliver them. It further appeared, from the testimony, that prior to the fire the German American policies had been sent to Todd's store by a clerk in Turpin's office, for delivery, but that the clerk, finding Todd absent, had brought the policies back with him. After the fire, the German American Insurance Company denied all liability on the policies. From the evidence it appeared that Turpin's authority to rewrite his Traders' business in the German American Company arose in the following manner. Turpin's agency, along with other insurance companies, represented the German American. On May 4, 1906, Turpin received from that company the following telegram: "Traders of Chicago in the hands of receivers." Turpin then called up, by telephone, Reynolds, the German American Company's general agent in Atlanta, and asked him to reinsure the risks thus cancelled by the insolvency of the Traders Company, without expense to him or his customers. Reynolds refused to do this. Turpin said, "It will be a great loss to us." Reynolds replied, "We can't help that; you can protect the business." Turpin said, "Yes, if we have got enough money." The result of the conversation was that Reynolds authorized him to rewrite the Traders' business in the German American Company, but with the understanding that he was to pay the premiums. On May 5, the home office of the German American Company sent a telegram, which they confirmed by letter, as follows: "General Agent Reynolds advises he has authorized you to rewrite in German American all Traders business, to become binding from to-day. We approve his action. Please forward immediately schedule of all lines in excess of $2,500 and let schedule of balance of business follow as soon as possible." On May 7, Turpin received the following letter from general agent Reynolds: "In re Traders' business. Please do not fail to immediately comply with com-

pany's request to forward schedule of all lines in excess of $2,500 for the reason that they want to protect their excess liability, if any exists. . . It is my intention to visit Macon again in the next day or two, when I will be able to go over the Traders' business with you, and, if there is anything we don't want, cut it out." Turpin reported to the German American Company the premiums on the Traders' business in his May account, and in this report the premium on the Todd policies was included. On July 6, a month later than the fire, Turpin received from the insurance company the following letter: "The purpose of this letter is to advise you that we have eliminated from your May account the premiums on cancelled policies No. 5462 and No. 5493 [the Todd policies], reducing the balance to be remitted by you for that month to $1,192." These policies in suit were duly written along with the policies on all the other Traders' business which Turpin rewrote in the German American Company, and they were duly entered upon the policy register of that company prior to the date of the fire. Reynolds, the general agent, looked over the policy register at the time he came to Macon pursuant to the appointment made in his letter above quoted, and these Todd policies were registered there at that time. By certified transcript from the records of the Circuit Court of Cook County, Illinois, and of the United States Circuit Court for the Northern District of Georgia, it was shown that the Traders' Insurance Company was judicially declared insolvent on May 5, 1906. There was other testimony, but a consideration of it is unnecessary for the determination of the propriety of a nonsuit.

In addition to excepting to the nonsuit, the plaintiff in error further complains that the court erred in excluding testimony going to show that Turpin rewrote all his Traders' business in the German American Company, that as to all the other policies so rewritten that company had accepted the risk, although at the time of Todd's fire nearly all of these policies were in Turpin's possession, and that the company accepted the premiums on all these policies from Turpin; also that these other policies, as well as Todd's, were duly entered upon the German American register in Turpin's office.

The further exception is made that the court refused to allow the plaintiff to prove that it was a custom of long standing in

Turpin's agency to rewrite policies for customers as they expired, without previous instructions, and to hold these policies for the convenience of customers, and to pay the premiums to the insurance companies for customers, whether they had been collected from the customers at the usual time for remittance or not; also, to prove that this custom existed generally in all insurance agencies in the city of Macon.

*Lane & Park,* for plaintiff.

*Spencer R. Atkinson,* for defendant.

POWELL, J. (After stating the facts.)

1. It may be said generally that to constitute a completed contract of insurance, the minds of the parties should meet and agree upon five things: (1) the subject-matter to which the policy should attach; (2) the risk insured against; (3) the duration of the risk; (4) the amount of indemnity; (5) the premium to be paid. 1 Wood on Insurance, §5; Michigan Pipe Company *v.* Michigan Ins. Co., 92 Mich. 482, 20 L. R. A. 277; May on Insurance, §43 et seq.; Joyce on Insurance, §43. "All the essentials need not, however, be expressly negotiated upon, since they may be understood, as where the terms of the usual policy are presumed to have been intended; or where the usual rate of premium is presumed to have been meant; or in case the duration of the risk is understood to be the same as in a former policy; or where by custom and usage a certain course of dealing has been established." Joyce on Insurance, §46; Wynn *v.* Niagara Insurance Co., 91 N. Y. 186; Audubon *v.* Insurance Co., 27 N. Y. 222; Home Ins. Co. *v.* Adler, 71 Ala. 516. In this State, by the Civil Code, §2089, "Such contract, to be binding, must be in writing; but delivery is not necessary if, in other respects, the contract is consummated." *New York Life Ins. Co.* v. *Babcock,* 104 *Ga.* 67; *Southern Ins. Co.* v. *Kempton,* 56 *Ga.* 339. Although a policy of insurance has been written, the insurer may defend against an action thereon, provided it is made to appear that the minds of the parties have never met as to the essential elements. On the other hand, a plaintiff in an action against an insurer may recover upon a policy written, but not delivered, if it appears that the policy was executed by the insurer in response to an offer on the former's part to take such insurance; which offer may be direct, immediate, and express, or may be implied from general language, sur-

rounding circumstances, or a previous course of dealing. This offer need not be made personally, but may be made by an agent. The consideration of the contract may consist either of the payment of the premium by the insured or by another, or of a promise, express or implied, to pay it; which promise likewise need not be the personal promise of the insured, but may be the promise of any other person, acceptable to the insurer. · These generalizations are not only deducible from those recognized rules of law which govern nearly all contracts, but are also sustained by the practically unbroken current of authority in England and America. See, in addition to the authorities cited above, *Fireman's Ins. Co.* v. *Pekor,* 106 *Ga.* 1; *Mechanics Ins. Co.* v. *Mutual Assn.,* 98 *Ga.* 266; Lebanon Ins. Co. *v.* Hoover, 113 Pa. St. 591, 57 Am. Rep. 511, and notes. We have thus outlined these general principles prefatory to the discussion of the particular phases presented by the case at bar, with the intention of using them as postulates.

2. The trial court granted a nonsuit against the plaintiff; the question therefore presented is whether there is any view of the evidence under which he was entitled to have his case submitted to the jury. After a review of the facts set out in the record, we are of the opinion that there are at least two theories on which a verdict in his favor could have been sustained. First, we think that, under Todd's testimony that he had directed Turpin's agency to carry $6,000 of insurance on his stock of goods, the jury could have found that this request or direction amounted to a standing offer on his part to the insurance companies represented in that agency, to take from them to that amount, according to a distribution among them to be made in Turpin's discretion, insurance policies in usual form at the usual rate of premium, on the stock of goods in question. This offer to take would not alone make a contract; but the insurance company's issuance of the policy in response thereto would complete it; for, in this view, it is easy to see that the minds of the parties would meet upon the necessary elements of the contract, namely, that the subject-matter should be the stock of goods in question; the risk insured against, fire; the duration of the risk, the uniform expiration of the policies; the amount of the indemnity, that portion of the $6,000 that Turpin should write in each company; the premium, the usual and customary rate. In those cases where the customer of

an insurance agency, by leaving a standing order for so much insurance, or for certain lines (to quote a phrase from the parlance of the insurance world), or, by reason of allowing that agency, from year to year, to renew certain policies, gives warrant to the inference that he desires a uniform amount of insurance on a certain risk kept in force, and, in response to this implicit offer to take such insurance policy, the insurer writes one in exact accordance with what the circumstances imply the nature of it should be, it violates neither law nor common sense to allow the jury to find that a contract exists. It is true that under this course of dealing the person taking the insurance may not know what particular insurer stands as the other contracting party, as in this case Todd did not know the names of the insurance companies in which his policies were written. But this is nothing new to the law of contracts. As is said in 9 Cyc. 372, "It is not necessary, however, that both parties [to a contract] shall be ascertained or in existence at the time the offer is made, if the offer is accepted by one who is within its terms." A familiar example is exhibited in cases of offers of reward. This court also noted an example in the case of *Anderson* v. *State*, 2 *Ga. App.* 1, 58 S. E. 412. In Michigan Pipe Co. *v.* Michigan Fire Ins. Co., 92 Mich. 482, 20 L. R. A. 277, the same contention was made as is made in this case, that the person claiming the insurance had not effected it, because he had not made his application to any particular company but had merely asked an insurance agency to write him so much. The court there says: "An application to an insurance agent representing several companies, for a certain amount of insurance on specified property, the agent to select the companies and distribute the risk, and his agreement so to do and give the insurance, constitute a valid contract of insurance with each company as soon as its policy is signed, although the policies are not delivered until after the property is destroyed by fire; since, in distributing the risk, the agent acts for the assured. That the rate of premium has not been paid or fixed will not prevent the commencement of a valid contract of insurance, where there is a generally understood rate on that class of risks and the usual course of business between the parties has been for the agent to collect the premiums at his convenience after the issuance of the policies." Further in the majority opinion the court, in referring to the request

made by the plaintiff to Schmeck, the manager of the insurance office, to write him so much insurance, without designating the companies, says: "Indeed, in the ordinary course of business this very service might well be contemplated and expected by both parties. Schmeck having been directed to select the insurers and distribute the risk, both parties were bound by that selection and distribution when made. Both parties contemplated several contracts, and both were bound as the several contracts were executed. Neither defendant nor any of the other insurers were bound until that selection and distribution were made. Neither had agreed to take all or any specific portion of the amount. Defendant received no proposition to issue a policy for the whole amount. It received an application for the exact amount for which the policy executed by it was issued. The illustration [proposed by Grant, J., dissenting] as to the 1,000,000 feet of lumber is not an apt one. If A. directs B. to purchase 15,000,000 feet of lumber, knowing that it must be purchased in 15 different parcels and of as many different persons, and B. enters into 14 different separate contracts with as many persons on behalf of A., for 14,000,000 feet, it is evident that neither of the 14 persons could repudiate the contract simply because B. had not contracted with still another person for an additional 1,000,000 feet, nor could A. repudiate the contract because his agent had not purchased the additional 1,000,000 feet. To the extent that B. dealt with each, his authority was ample, and bound his principal, and neither of the parties with whom B. contracted were concerned in his favor to make further contracts. The insurers in the present case were in no different position than if the lumber had been insured for the entire amount, and one of the policies had been cancelled; and it is not claimed that the amount of the additional insurance was represented as greater than it actually was. The name of the company, the location and amount of the risk, in each case, had been committed to Schmeck. The rate of premium not having been paid or fixed by the parties, plaintiff became liable to pay the usual or going rate. The policies contained no promises that they should not become operative until the premiums were paid. Schmeck had written other policies for the same parties, and had afterwards, in the usual course, collected his premiums, and no demand was made for the premiums at the time that the insurance was applied for. In deter-

mining such matters, consideration must be had for the manner in which the business had been usually carried on. To lay down the rule that in all cases the premiums must expressly be agreed upon and paid, or credit expressly given, would be contrary to the general understanding among business men, and contrary to prevailing methods." In the footnote to the case from which these quotations are taken, in 20 L. R. A. 277, are cited many cases sustaining in principle the proposition asserted.

It is to draw no strained inference to say that Todd's expression to Turpin of a desire that his agency should carry $6,000 of his insurance was authority to Turpin, in the event any portion of the insurance originally written should become cancelled by intervening events, to replace it with a policy in some other company represented in that agency. In accordance with Todd's direction, Turpin was carrying in his agency the $6,000 of insurance desired; the Traders' Insurance Company became bankrupt, and therefrom followed the legal result that the two $2,000 policies which Turpin had written for him in that company were ipso facto cancelled (see 4 Joyce, Ins. §3591; Boston R. Co. v. Mercantile Trust Co., 82 Md. 535, 38 L. R. A. 97; Doane v. Millville Ins. Co., 43 N. J. Eq. 522). Under these circumstances, may not the jury imply from Todd's previous directions, from the transaction as it followed, from the very relationships created, an assent on Todd's part to a new policy in lieu of the old one? If his assent is supplied, the contract is complete, for the insurance company expressed its assent by writing the policy. In determining whether Todd's assent is to be inferred or not, the jury would be authorized to take into consideration not merely his exact words, but also all the surrounding circumstances, and to apply their common knowledge as intelligent men as to what a customer means when he asks an insurance office to carry so much insurance for him.

This view of the case is tenable without asserting that Turpin in any wise acted as agent for Todd in the procurement of the insurance. At first blush it might seem that in choosing, from among all his companies, the particular companies to which this business should be given, Turpin acted as Todd's agent; but there is no logical necessity for this conclusion. If I ask the liveryman to send me a carriage, I do not constitute him my agent to pick out a particular carriage from among the many he owns; the

choice as to which one he shall send, when I do not specify, is but a part of his own business. If a retail grocer asks a commission merchant, who represents several producers having cabbages for sale, to send him a shipment of cabbages, the commission merchant does not act as agent for the grocer when he decides to fill the order through his principal A., rather than through his principal B. We have adverted to this proposition because the defendant in error has stressed the argument that Turpin could not be the agent of Todd to procure the insurance and of the company to write it; and we have endeavored to show that in the transaction as thus viewed, no dual agency exists; that Todd in asking Turpin to carry the line of insurance, although he did not designate the companies, was dealing with him strictly as the agent of the opposite party.

3. We shall now take up the other view of the evidence upon which recovery could have been sustained; and this view does conceive of Turpin's acting as agent for Todd as well as for the company. Let us first show that if Turpin (the legality of a dual agency for the moment being pretermitted), assuming to act for Todd, but without any real authority to bind him, procured from the insurance company a policy of insurance in Todd's favor, and paid the premium, or by an arrangement with the company substituted his promise to pay for actual payment, Todd could, after the fire, upon discovery of the fact that Turpin had assumed to act for him, ratify the contract and hold the company upon it. "The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him, or subsequently ratifies the acts of another in his behalf." Civil Code, §2997. "By the ratification of an unauthorized act, the relation of principal and agent, with all the rights and duties thereto, is as fully established as if the authority had been conferred originally; the ratification relates back to the time of performance of the act." 1 Am. & Eng. Enc. Law (2d ed.), 1213; Civil Code, §3019; *Atlanta Buggy Co.* v. *Hess Spring Co.,* 124 *Ga.* 342. "As, from what has already been said, the principal thus acquires a right to elect whether he will adopt the unauthorized act or not, it must be admitted, that the parties do not generally stand upon equal terms; since the principal may always elect to ratify the act, if it is for his benefit, and to disavow it, if it is to his injury. But

this consequence has never been allowed to overcome the force of the general doctrine. Thus, for example, where an unauthorized agent procured an insurance to be made upon a certain ship for the benefit of the owner thereof; and the ship was lost during the voyage; and long after the loss the owner ratified the insurance, and a suit was brought against the underwriters, it was held to be no objection to the recovery, that the ratification was not until long after the loss, and that the owner would not have been bound to pay the premium, if the ship had safely arrived. For the agent had still a right to effect the insurance, and to take the chance of its being adopted; and he could not have recovered back the premium paid by him to the underwriters, upon the ground that he had no authority, and that, therefore, there was no interest insured; because the underwriters would have borne the risk, until there had been a disavowal by the principal." Story on Agency (8th ed.), §248. See also, to the same effect, 3 Kent's Com. *260, 261; Hagedorn v. Oliverson, 2 Maule & Selwyn, 485; Routh v. Thompson, 3 East, 274 (new ed. 144); 1 Joyce on Insurance, §642. 1 Clark & Skyles on Agency, §112, states the same doctrine, but takes care to confine its application to cases where a sufficient consideration has been paid by the agent to the opposite party to the contract; but in this case this is an immaterial limitation, because the insurance company accepted Turpin's promise to pay the premium, as a sufficient consideration for the policy. So that leaving out of consideration the lawfulness of Turpin's acting as agent of both parties, it will be seen that if he, assuming to act for Todd, procured a contract of insurance for him, the latter, although ignorant of the existence of the policy until after the fire, might then ratify the former's act and sue upon the policy.

The defendant in error resists the proposition just announced, by saying that if Turpin, acting as Todd's agent by his authority, or assuming to act in his behalf without his authority, procured the insurance from himself as agent for the insurance company, the policy is void; a dual agency being contrary to public policy. It is ruled in *Ramspeck* v. *Pattillo,* 104 *Ga.* 772, and in *Phœnix Insurance Co.* v. *Hamilton,* 110 *Ga.* 14, that "An agent of a fire-insurance company, authorized to contract for insurance in its behalf, can not, without the company's consent, become in his individual character the agent of a property-owner who desires to obtain in-

surance in that company, . . for the reason that an agreement to act as agent for both parties would be an undertaking to perform inconsistent duties, and a mutual agency of this kind requires the consent of both parties." In the recent well-considered case of Arispe Mercantile Co. *v.* Capital Ins. Co., decided by the Supreme Court of Iowa on February 9, of the present year (36 Insurance Law Journal, 513), it is held, "An agent of a fire-insurance company who is an incorporator of a mercantile company can not, acting as such agent, issue a valid policy to the mercantile company, though acting in good faith, where the insurer is ignorant of his relations to such company, on the principle that he can not act as agent in transacting business for his own benefit." By the very exceptions borne on the face of the rule as stated in these decisions, the present case is distinguished from those cited. All duality of agency is not forbidden. If the principal who seeks to repudiate knows that his agent is also acting for the other party, or if he authorizes a course of dealings wherein, from the very nature of the agency, the agent is expected to act also for the other party, the principal can not complain. Another exception to the doctrine generally forbidding dual agencies is that the agent may represent both parties, provided that the acts in which he is to represent the one in no wise conflict with the full exercise of his duty to the other. An agent may perform mere ministerial acts, involving no discretion, for one of the parties to the contract, though he is agent for the other party. He is forbidden to act for both only when there is opportunity that the skill and judgment which he should exercise for the one may conflict with the skill and judgment he should exercise for the other. "It is held that the rule that an agent can not act for both parties does not preclude an agent from acting for both parties where he acts in certain matters for one party, and then in different transactions for the other party, even though the parties are insurer and insured, and the acts are done in relation to the insurance; nor does the rule preclude an agent from acting for two principals in their mutual transactions." 1 Joyce on Insurance, §663, citing *Fitzsimmons* v. *Express Co.*, 40 *Ga.* 330; 2 May on Insurance (4th ed.), §500; *Red Cypress Lumber Co.* v. *Perry*, 118 *Ga.* 876; Insurance Co. *v.* Wilkinson, 13 Wall. 222; Michigan Pipe Co. *v.* Michigan Ins. Co., 92 Mich. 482, 20 L. R. L. 277; *Petersburg Ins. Co.* v.

*Manhattan Ins. Co.,* 66 *Ga.* 446; *Clay* v. *Phœnix Ins. Co.,* 97 *Ga.* 44 (2), 53; Clark & Skyles on Agency, §§ 29, 414. "The maxim that 'no man shall serve two masters' does not prevent the same person from acting as agent, for certain purposes, of two or more parties to the same transaction when their interests do not conflict and when loyalty to the one is not a breach of duty to the other." Northup *v.* Germania Ins. Co., 48 Wis. 420.

Now it will be noted in the present case that the defendant company did not rely upon Turpin's judgment, skill, or loyalty as its agent in the writing of the policies sued on. Turpin was not called upon to do more than the ministerial act of writing out the policies; for the company, acting upon its own judgment, agreed to take over all the cancelled Traders Insurance Company risks in bulk; and as further evidence of the fact that it was not relying upon Turpin's judgment as to the desirability of particular risks, it gave him instruction to write "all Traders' business, to become binding to-day," and also notified him that the general agent would come in a few days and go over the risks, and said, in that connection, "if there is anything we don't want, will cut it out." The controlling elements which rendered the dual agency in the case of *Ramspeck* v. *Pattillo,* 104 *Ga.* 772, and *Phœnix Insurance Co.* v. *Hamilton,* 110 *Ga.* 14, obnoxious to public policy, were entirely absent here. In the case at bar, the agent's duties were merely ministerial, as they were in the case of *Petersburg Ins. Co.* v. *Manhattan Ins. Co.,* 66 *Ga.* 446 (7). Nor can it be contended with any countenance whatever that the insurance company did not know that Turpin was assuming to act in behalf of all such of his customers as formerly had Traders' policies, in obtaining new insurance for them. From the telephone message between Turpin and the defendants's general agent, from the letters subsequently written by the home office, and from the fact that the general agent afterwards came to Turpin's office, checked the policy register, and saw the way the business had been written, the conclusion is irresistible that the company knew that Turpin, out of a desire to maintain the good name of his insurance office and to avoid a loss of customers by reason of the failure of one of his companies, was, for his own benefit as well as for the benefit of his customers, endeavoring to procure for them, at his own expense, new insurance on the cancelled risks. The defendant company

necessarily knew, from the circumstances surrounding the trans-action, that while Turpin was their local agent, he was, in this instance, acting not in its interest alone, but in his own interest, and also in the interest of all of his customers who had held Trad-ers' policies. There is always some slight conflict between the in-terest of the local agent, whose commissions depend upon the vol-ume of the business he writes, and that of the company he rep-resents; for there is a natural temptation that he should increase the volume by taking risks not wholly desirable; and on this oc-casion, the agent's adverse interest was measurably greater; but, knowing all this, the company expressly authorized him to trans-fer in bulk to them all these risks, and accepted from him a debit memorandum for the premiums. If the defendant company did not expect to be liable to all the holders of the Traders' policies, it should not have telegraphed Turpin to rewrite all those policies in bulk, and should not have accepted his promise to pay the premi-ums thereon. Insurance companies should not reach out for pre-miums in bulk without expecting to incur a corresponding liability for losses. Turpin, by thus securing the interests of his customers, did no actual or constructive wrong to his principal, the defendant company. In probable anticipation of converting to itself the Trad-ers' business, it sent Turpin a telegram telling him of that com-pany's insolvency; in response, he confronted it with his needs in the situation; it, with full knowledge, offered to meet that need, not gratuitously as Turpin at first desired, but in consideration of the usual premium. Test this transaction by considering whether Tur-pin therein incurred any civil liability to his principal; for if an agent unlawfully and without his principal's consent becomes a dual agent in violation of the loyalty due the first principal, he is civilly liable therefor. Could the defendant company success-fully sue Turpin on account of this transaction? To ask the ques-tion is to answer it. The company's instructions in the record would be a perfect defense. Therefore, while Turpin became the agent both of the insurer and of the insured, he was lawfully so; and the insurer will not be allowed to repudiate the contract made through him.

Our conclusion is that Todd would have been entitled to recover upon the theory that the policies sued on were issued in pursu-ance to his standing instruction to Turpin's office; but our further

conclusion is, that, irrespective of any previous request on his part for the insurance, he had the right, upon discovering that Turpin, with the consent of the insurance company, had assumed to represent him in obtaining the policies, to ratify Turpin's act and hold the company liable for the loss.

4. The court erred in not allowing the plaintiff to prove that, pursuant to the authority given by the defendant, Turpin had rewritten all the Traders' policies and had entered them upon the register of the defendant company. This circumstance, especially in connection with the fact that the general agent of the defendant came to Turpin's office to inspect this business and made no objection, was relevant.

5. While it was not competent for the plaintiff to prove the custom of Turpin's agency alone, of rewriting expired policies without explicit requests from customers and of paying the premiums, becoming personally responsible to the company for them, and of holding the policies at his office for the convenience of those insured, unless knowledge of the custom was brought home to the insurer in this case, yet it was competent for the plaintiff to show that there was a general custom of that kind prevailing in the city of Macon; and, as a part of the proof to that end, it might show that the custom existed in Turpin's office, provided this was supplemented with proof, such as was tendered, showing that it likewise prevailed generally in other agencies. "It is well settled that insurers are bound to know the customs of a place where they transact business, and are assumed to have made their contracts in reference to such customs." Joyce on Insurance, §50; May on Insurance (4th ed.) §582 and 23B; Political Code, §1, par. 4; Civil Code, §5206; Lebanon Insurance Co. v. Hoover, 113 Pa. St. 591, 57 Am. Rep. 511 and notes; *Lauchheimer* v. *Jacobs,* 126 *Ga.* 261, 265; *Hardeman* v. *English,* 79 *Ga.* 387; Clark & Skyles on the Law of Agency, §69.          *Judgment reversed.*