See also D.C., 49 F.R.D. 275.

**AETNA INSURANCE COMPANY**

v.

**GLENS FALLS INSURANCE COMPA-NY, South Carolina Insurance Company, The London Agency, Inc., Frank M. Kinnett, E. F. Edwards, and J. W. Boyd.**

Civ. A. No. 13092.

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 17, 1971.

---

Smith, Cohen, Ringel, Kohler, Martin & Lowe, Atlanta, Ga., Robinson, Robinson & Cole, Hartford, Conn., for plaintiff.

Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for Glens Falls Ins. Co.

George B. Haley, Jr., Emmet J. Bondurant, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for The London Agency, Inc., Kinnett-Edwards-Boyd, Ltd., Frank M. Kinnett, E. F. Edwards and J. W. Boyd.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for South Carolina Ins. Co.

## ORDER

EDENFIELD, District Judge.

In this non-jury case the court is called upon to resolve a dispute between a primary insurer (Aetna), two alleged reinsurers (South Carolina Insurance Company and Glens Falls Insurance Company), and two independent general agents concerning the liability of the respective parties in connection with the issuance of two certificates of reinsurance.[1] In Count One of its complaint, Aetna contends that the two reinsurers issued to it two valid and binding certificates of reinsurance; that a loss was thereafter incurred, and that the two reinsurers now fail and refuse to pay their prorata share of the loss. In Counts Two and Three of its complaint Aetna prays in the alternative that if it be found that the two certificates of reinsurance were not valid and binding upon the reinsurers, that it (Aetna) have judgment against the two insurance agents for negligently causing the invalid certificates to issue. Each of the defendants in due course filed their answers and the two reinsurers also filed a counterclaim against the plaintiff and a cross-action against the two general agents. In the view the court takes of the evidence and the law, what appears superficially to be a complicated situation becomes relatively simple. The details of the various contentions will be discussed in the following findings of fact and conclusions of law.

For some time prior to August 1963 three gentlemen named Kinnett, Edwards and Boyd, as general partners, and certain others as limited partners, operated a general insurance agency in Atlanta under the name and style of Kinnett, Edwards & Boyd, (hereinafter KEB), a limited partnership. The individual members of this partnership were

---

1. The litigation first began when Aetna sued in the state courts of Connecticut. These cases were removed to the United States District Court for the District of Connecticut. In the meantime, related litigation had been filed in this district. The Connecticut cases were thereafter transferred here, were consolidated and repleaded, and now appear as the present action.

also the sole stockholders in another and separate surplus lines agency known as The London Agency, a corporation. At some time during the summer or fall of 1963, the plaintiff Aetna Insurance Company purchased all of KEB's insurance business and physical assets. KEB's general and limited partners became employees of Aetna but were allowed to continue to operate The London Agency for their own account. Aetna purchased no part of London and it continued as an entirely separate and independent agency although, under the terms of the sale of KEB's business to Aetna, Aetna agreed to provide clerical and other assistance to KEB and London in "running off" the existing KEB business and in placing Aetna's reinsurance risks in a four-state area. This purchase of KEB by Aetna was to take effect and did take effect as of January 2, 1964.

During the month of August 1964 Aetna assumed the obligations of primary insurer under a policy of insurance originally issued by the Yorkshire Insurance Company to a broadcasting company in Jackson, Mississippi, insuring against certain losses to a television tower and transmitter. Thereafter, Aetna sought to "lay-off" or reinsure 80% of its obligation under this policy and requested The London Agency to obtain reinsurance coverage for it. Pursuant to this request, a Mr. Paul Palmer, a limited partner in KEB (and who had been acquired as a full-time Aetna employee by reason of Aetna's purchase of KEB's business) caused The London Agency to issue to Aetna two certificates of reinsurance stating that South Carolina Insurance Company and Glens Falls Insurance Company reinsured Aetna for 30% and 20%, respectively, of the broadcasting company risk.[2] In order to understand the complications which this created, it is necessary to digress and explore what appear to be the undisputed customs and usages applicable to

reinsurance between the major insurance companies, and to then outline what transpired in this particular case.

It is customary among those desiring to engage in the reinsurance business for a company desiring to write reinsurance to enter into a contract or "treaty", sometimes directly with the primary insurer which desires reinsurance, and sometimes with a general agent, whereby the reinsuring company will formally or informally agree that one or more experienced underwriters, sometimes an employee of the primary insurer and sometimes an employee of a general agent, shall have authority to bind it (that is, the reinsuring company) for a designated portion of a risk or risks originally written or assumed by the primary insurer. It is thus quite common in the trade for a given "underwriter" to be both a general employee or agent of a primary carrier and yet be designated as a special agent for the reinsuring carrier with authority to bind the reinsurer on certain risks or types of risks defined in the "treaty" between the companies. Sometimes also, as happened here, the reinsuring company will limit or restrict the types of risks which it is willing to reinsure. Having made these underlying arrangements, the actual handling of a reinsurance transaction proceeds in a most informal fashion. For example, it is quite common for an "underwriter" (who is a general employee of a primary insurer and who has also been designated as its "underwriter" by the reinsuring company) to bind the reinsuring company without any further notice of any kind to the reinsuring company, except that periodic reports, showing for the most part only the amounts involved, are forwarded to the reinsuring company along with that company's prorata portion of the premium. In other words, as between the reinsured company and the reinsuring company there is no such thing as a policy of reinsurance, each

---

2. The third reinsurer of the remaining 30% of the risk has paid off and is not before the court.

company trusting the other to deal fairly in assigning or "ceding" risks and dividing the premium. As all of the witnesses in this case testified, reinsurance transactions between companies are conducted almost exclusively on a "good faith" basis and with a minimum of formality. There appear to be various reasons for this course of conduct. In the first place, to handle each reinsurance transaction on a facultative basis would compound the clerical work of both companies. Second, and more important, it would involve a considerable time lag. Frequently when a primary insurer writes, and thereby assumes, a very large and very dangerous risk, it wishes to spread or "lay-off" portions of that risk on other companies immediately lest, in the interim, it be bankrupted by having to pay the whole claim. Apparently with these factors in mind, the practice described grew up over the years and with minor variations appears to be uniform throughout the insurance industry.

With this background we return now to the present case. At all relevant times herein, both South Carolina Insurance Company and Glens Falls had reinsurance "treaties" with both KEB and The London Agency, the treaty of South Carolina Insurance Company having been executed prior to Aetna's acquisition of KEB and Glens Falls' treaty having been executed later. In both instances the treaties between the reinsurers (South Carolina and Glens Falls) excluded or withheld from the underwriter authority to reinsure inland marine risks. From the great weight of the evidence in the case it appears that the broad form coverage of a television tower would constitute an inland marine risk, although the evidence also clearly shows that protection of such a tower from windstorm (the cause of the loss here) might also have been written under a policy providing fire and extended coverage. It also appears without dispute that in each instance the reinsuring company (both South Carolina and Glens Falls) designated or at least accepted

Paul Palmer as the person or one of the persons authorized to act for them in binding reinsurance commitments under these treaties and on their behalf.

It appears that by insurance standards a television tower is a hazardous risk, although of course and by the same token, it carries a higher premium. The amount here involved was large. Aetna, who had assumed the primary coverage, desired to lay-off or reinsure 80% of its risk and it wished to do so speedily. It thereupon sent a teletype message to Atlanta advising of its desire to obtain reinsurance. This message ultimately came to Palmer who was, of course: (1) a general employee of Aetna (having been acquired by Aetna in its purchase of KEB); (2) an "underwriter" for KEB and The London Agency; and (3) also an "underwriter" for South Carolina and Glens Falls in accepting reinsurance risks for them. Since this first teletype message did not contain enough information, Palmer or someone for him sent a teletype reply asking for more information, which Aetna supplied from its Hartford office. This information from Hartford to Palmer clearly indicated that the risk to be insured was a television tower, gave the name of its owner, and its geographical location. Palmer himself admits that from the information furnished by Aetna he should have either declined to place the reinsurance with South Carolina and Glens Falls, since such risks were excluded under his authority, or should, at least, have notified South Carolina and Glens Falls of the type of risk involved. He admits he "slipped up" and did neither. Moreover, under the method of doing business previously described the first actual knowledge the reinsurers had of Palmer's attempt to commit them on the risk was when they received a consolidated monthly report showing the amounts of commitments made by Palmer and enclosing to the reinsurers a check for their prorata share of the premiums thereon. Even this information failed to disclose in any fashion that Palmer had committed them or attempt-

ed to commit them on an inland marine risk, nor did it show the name of the insured or that a television tower was involved. South Carolina and Glens Falls therefore simply accepted their portions of the premiums without any knowledge of their potential exposure and without investigation. In the meantime, and in due course, and again in accordance with the practice of the trade, Palmer forwarded to Aetna in Hartford, in the name of The London Agency, two certificates of reinsurance, indicating that he had complied with Aetna's request and that reinsurance had been obtained from South Carolina and Glens Falls as directed.

Subsequently, a small claim was made under the policy by the owner of the tower. This claim was paid in due course by Aetna as the primary insurer and Aetna in turn forwarded a bill to The London Agency calling on South Carolina and Glens Falls to pay their part of this small loss. Palmer (London) in turn prepared a proof of loss showing the insured party (really the reinsured party) to be Aetna Insurance Company. This proof of loss for the first time contained a designation or prefix "IM" before the basic policy number which, under the custom of the trade, would have or should have indicated to the home offices of South Carolina and Glens Falls that they were paying off an inland marine claim. Apparently both companies overlooked this designation[3] and paid their part of the small claim without comment or protest. But in March of 1965 the whole tower was destroyed by a tornado. Again Aetna paid the claim in full, amounting to $375,609.73, and again submitted through The London Agency a bill to South Carolina and Glens Falls for their prorata share of the loss. When this bombshell hit the two reinsurers they commenced a more thorough investigation, whereupon the full facts came to light. They declined to pay their respective shares of the loss, claiming that their designated underwriter had exceeded his authority and that the certificates of insurance were therefore invalid. One of the reinsurers also undertook to refund the premium previously collected and, when the present suit was filed, both then filed counterclaims against Aetna to recover the amounts previously paid in satisfaction of the previous small loss under the policy.

Before turning to the conclusions of law which the court has drawn, there is one other facet of the situation which should be explored. Each of the reinsurance treaties between the reinsurers and The London Agency contain the following language:

"Errors and omissions inadvertently made in connection with this agreement shall not be held to relieve either party of any liability which would attach hereunder if such error or omission had not been made."

■ At first blush it would appear that this "errors and omissions" clause would save the day for Aetna in and of itself. Closer analysis of the language of this clause, however, shows that it cannot be applied under the present facts. It is clear, for example, that the only "errors and omissions" which this clause excuses are those respecting any liability "which would attach hereunder *if such error or omission had not been made.*" But here, if the error had not been made (that is, if Palmer had not erroneously exceeded his authority) there would have been *no* liability at all. Hence, under these facts this exculpatory clause saves nothing.

Nevertheless, the court concludes that under the facts and as a matter of law the reinsurers, South Carolina and Glens Falls, are bound by their commitment and that Aetna can recover as prayed in Count One of its complaint.

■ The crucial question, of course, is who Palmer was representing when he

---

3. It also appears that during the same period South Carolina had accepted from Palmer and The London Agency other inland marine risks without any investigation, protest or objection.

made his mistake and who must bear the loss as a consequence thereof. It also takes no more than a glance at the facts to see that in broad aspect, Palmer was at least a dual, if not a triple or quadruple, agent. First, he was a salaried employee of Aetna. Second, with the full knowledge and consent of all parties he was also performing a service for The London Agency in undertaking to place the reinsurance. Finally, with their full knowledge, assent and authority, he was the agent of South Carolina and Glens Falls in accepting reinsurance commitments in their behalf.

■■ It is true that as between Palmer and the two reinsurers (South Carolina and Glens Falls) Palmer exceeded his authority, negligently or otherwise, but it is equally clear to the court that, as far as Aetna is concerned, he had apparent authority, the evidence clearly showing that Aetna had no knowledge of the limitations and exclusions contained in the treaties between the two reinsurers and The London Agency. Nor does the court believe that this conclusion is altered or that Aetna was "charged with knowledge" of Palmer's lack of authority by the series of events by which Aetna acquired KEB and at the same time acquired Palmer as an Aetna employee. The court is familiar with the rule that, ordinarily, the principal is chargeable with knowledge of its agent; but here Palmer had at least three principals and at the moment he purported to accept the risk for the reinsurers he was clearly acting for them, not Aetna. Here, Aetna in transmitting its order for reinsurance to The London Agency did and performed everything it could have done to put both Palmer and the reinsurers on notice of the risk involved. It clearly told Palmer that the object being insured was a television tower. From all the circumstances and from all the evidence, and indeed, by Palmer's admission, he knew or should have known from the information furnished by Aetna that an inland marine risk was involved and being familiar with the treaty agreements he is, of course,

charged with knowledge that he had no authority to cover such risks for the reinsurers. Under these circumstances and bearing in mind the undisputed evidence by all parties that reinsurance transactions by the insurance companies are conducted on a "good faith" basis, we think that as between the parties, Aetna is entitled to protection. This conclusion is buttressed by the fact, undisputed in the record that through the default of their chosen "underwriter", Palmer, they accepted and retained their proportionate part of the premium for the risk and actually paid a previous claim under the same policy. Moreover, during all of this period, if they had chosen to do so, they could have examined Palmer's documents and communications with Aetna respecting the transaction and thus discovered his error, but they failed to do so. At least as to South Carolina this dereliction assumes even more significance when it is recalled that if it *had* made such examination it would have discovered that during the same period Palmer had also erroneously ceded to them other inland marine risks, clearly marked as such, all of which they accepted and presumably paid. Aside from the doctrine of apparent authority this would seem to justify the court's previously announced conclusion on a theory of either ratification or estoppel.

It is stoutly insisted by the reinsurers that Palmer was not their "agent" but the agent of someone else (indeed, as they contend, of everyone else). It is undisputed, however, that they either authorized or designated Palmer to accept reinsurance risks on their behalf and accepted the policies thus ceded by him. By any definition this makes him their agent, although admittedly he may have also been the agent of Aetna for some other purpose in connection with the same transaction. *See* Todd v. German-American Insurance Co., 2 Ga. App. 789, 800, 59 S.E. 94 (1907). As § 4–101 of the Georgia Code provides:

"The relation of principal and agent arises wherever one person, expressly

or by implication, authorizes another to act for him, or subsequently ratifies the acts of another in his behalf."

The reinsurers fall squarely within this language and, as previously pointed out, in accepting this risk Palmer was acting, and could have been acting, only for them.

It follows that Aetna is entitled to recover the prorata share of its loss from the respective reinsurers, together with interest at 7% from the time proofs of loss were submitted. It also follows that the two reinsurers are not entitled to recover on their counterclaims in which they seek to recover reimbursement for the amounts paid in satisfaction of the small loss previously adjusted.

Finally, the two reinsurers (South Carolina and Glens Falls) seek to assert a cross-action against KEB and The London Agency and their errors and omissions carrier on a theory of indemnity. Since the court has held that in erroneously attempting to bind the reinsurers Palmer was acting as their agent, not as the agent of KEB or The London Agency, there can be no recovery on this cross-action.

Counsel may submit a judgment in conformity herewith.