# TILLIE ROMMEL v. NEW BRUNSWICK FIRE INSURANCE COMPANY.[1]

February 5, 1943.

No. 33,302.

[1]Reported in 8 N. W. (2d) 28.

A. J. *Rockne* and *Doherty, Rumble, Butler, Sullivan & Mitchell,* for appellant.

*Schacht & Schacht,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff prevailed in her action to recover for a fire loss to her farm dwelling and its contents. Defendant's motion for judgment notwithstanding or a new trial was denied, and it appeals.

Defendant is a foreign corporation duly authorized to do business in this state. Its activities include insurance against losses by fire or windstorm to rural as well as urban property. Its general agent for the state is R. M. Neely Company of St. Paul. E. H. Schacht, under the title of "E. H. Schacht Agency," was duly licensed as its agent at Red Wing and Rochester and, under that title, did an extensive insurance business as the duly licensed representative of some 54 insurance companies. (Hereinafter we shall refer to the Neely company as "Neely" and to the Schacht agency as "Schacht.")

Defendant's position on the vital issue here presented is stated in its brief in this form:

"We conclude that a contract of insurance can be made by parol, but before such a contract can be enforced or become effective, the person making it in behalf of the insurer must be the lawful agent of the insurer company at the time the alleged contract was or is made."

Since liability here depends upon authority of the individual with whom plaintiff dealt to act in defendant's behalf in the making of such a contract, the facts must be rather fully recited.

Plaintiff is the widow of Frank Rommel. Since his death and

during the times presently involved, she has owned the land and occupied the Rommel farm dwelling, located about two miles from Rochester. The Rommels also owned a meat market in the city, which was operated by their son. On June 17, 1940, plaintiff communicated with Schacht at Rochester about insurance on her buildings. She was not acquainted with Schacht, who resided at Red Wing. Because the Rommel family in the past had dealt in matters pertaining to fire insurance with a Mr. "Jim" Kelly, who had been in the insurance business at Rochester for many years, plaintiff asked for his son, P. F. Kelly, who had stepped into his father's shoes in the insurance business. Their office had been, and remained, in the Stoppel building. In December 1938, Schacht "bought out Mr. [P. F.] Kelly," who "was going to work for" Schacht and was to "stay right there in the office." Schacht took over the office and paid the rent all through 1939 and 1940, Kelly remaining there. His name appeared on the door with that of the "E. H. Schacht Agency," as did also that of one Pendle. On the Schacht letterhead was printed, "P. F. Kelly, Rochester Agent." Mr. Pendle took in hand such insurance at Rochester and vicinity as he himself procured for Schacht. Other business written at the agency was done by Mr. Schacht and Mr. Kelly. Pendle countersigned the policies which he procured for Schacht. His commissions were adjusted between them.

As a result of plaintiff's call, Mr. P. F. Kelly called at her place in the forenoon of June 18, measured and inspected the buildings to be insured, and, with plaintiff's help, arrived at the insurable value of each. The coverage on the property involved in this action was $6,000 on the dwelling and $2,000 on its contents. The insurance premium for three years was $300, fire and windstorm losses being included in the amount of the premium. Plaintiff was assured by Mr. Kelly that the insurance was to be effective at noon "that very day." She then paid $20 to apply on the premium, and in a day or two an additional $80 was paid at the butcher shop. In August another payment of $100 was made. On August 5 there was a small fire loss, largely due to smoke, which was adjusted

at $100 by Mr. Kelly, who assumed to act for the insurer, and this amount was applied as payment of the balance of the premium.

As to the effective date of insurance coverage, the practice was to date a policy as of the day when the application was made or, if the applicant so desired, at such future date as he might designate. Farm insurance, under the rules of defendant, was handled in the following fashion: The applicant would sign a written application containing a description of the property to be insured and other data as to size of buildings, distances between each, etc. The time when insurance was to become effective depended upon what the applicant stated in his application. The local agent would then forward the application to Neely at St. Paul, and the latter would forward the application, if approved by it, to the Chicago regional office of defendant, from where the policy later would be issued or refused.

On July 10, 1940, Kelly "of E. H. Schacht Agency" wrote Neely enclosing an application form for plaintiff. (No written application was ever signed by plaintiff.) He described the dwelling house as a "fine country home * * * in fine shape, heated with furnace and all in first class repair." He called attention to the fact that the applicant "is the widow of Frank Rommell who died a short time ago, and owned ones [one] of the largest meat markets in this town, and Her and Son are running it, also the farm." He stated that credit should be given to a "Mr. McCaulty, Your Special Agent [agent] who called on us just latey [lately]." This letter and the application were received by Neely on July 15, at which time Neely wrote "E. H. Schacht Agency, Rochester, Minnesota. Attention: P. T. [F.] Kelly." The subject matter of the letter is referred to in this language: "Re: Farm Application—Mrs. Frank Rommell." In the body of the letter Neely says: "We have your farm application for the above, and we note that the application indicates fire and lightning only, but the rules of the company are in writing farm business that we must also have the windstorm." An item of $4,000 on a barn was thought too high, and it was suggested that $2,000 would be more appropriate.

For these reasons, "We are returning the application to you and will ask you to please check this matter up and let us know. In the meantime please understand we are not in any way binding this business until such a time as we hear further from you." This letter was not answered, and on August 5 Neely again wrote "E. H. Schacht Agency" at Rochester and again referred to the subject matter as "Re: Farm Application—Mrs. Frank Rommell." That letter, too, was unanswered, and so Neely wrote Schacht on August 17 and again referred to the subject matter as in the former letters. Nothing further occurred until February 26, 1941, when another application, bearing date February 22, 1941, came from Schacht for plaintiff's insurance to take effect that day. That application bore the forged signature of plaintiff. She knew nothing about any of these matters, having been assured many times by Kelly that the policies had been issued and that they were being safely kept at the Schacht office. This last application was undoubtedly made after the fire and obviously was an effort on the part of Kelly to square himself with plaintiff and to make good his oral promises to her. Neely had no actual knowledge of the fire loss, and neither did defendant. So, unless Kelly, as Schacht's employe, represented them and thereby made his knowledge their own, plaintiff's cause must fail.

In the usual course of business Neely forwarded the application to the Chicago office and requested the issuance of a policy as of the date of the application (February 22), saying, "This policy comes to us from the E. H. Schacht Agency at Rochester, Minnesota." Plaintiff, of course, does not rely upon this application as a basis for recovery. This evidence came into the case only as proof of defendant's business methods and customs in respect to the effective date of policy coverage.

Mr. Pendle testified that he was the Rochester manager of Schacht. It was his understanding that both he and Kelly were Schacht's agents there, since Schacht wrote very little business at Rochester but devoted most of his time to the Red Wing office, where he had a clerical and office force of five persons. When at

Rochester, Schacht directed both Pendle and Kelly to write insurance, and Pendle was directed by Schacht to supervise Kelly's work. Mr. McClure, state agent for Neely, admittedly defendant's general agent in Minnesota, testified that he went to Rochester from time to time to supervise the Schacht agency. On such visits he did not find Schacht at the office, but usually found both Kelly and Pendle there. He "presumed" that Kelly was soliciting business for defendant there through the Schacht agency. Mr. Stoppel, the owner of the building in which Schacht had his office, testified that some time after the fire he engaged in a conversation with Schacht on the subject of Mrs. Rommel's fire loss. "I said I felt it was too bad that a fire like that would happen to Mrs. Rommel, and he said: 'Well, you don't need to worry about that there; the company is going to pay that loss.'"

Kelly was not licensed as an agent of defendant but did have agent's licenses from at least two fire insurance companies.

The court in its instructions to the jury gave a complete resumé of the conflicting claims of the parties. In speaking of what were deemed the vital issues involved, the court said:

"The company claims further that Kelly made no promise to her [plaintiff] in behalf of it or received any premiums from her in behalf of it, but that any promise that he made was made in behalf of some company that he was agent for. Now, if any of these contentions are true the defendant is not liable, and if you find any of them to be true in fact then that will end the case.

"In order to recover, therefore, the plaintiff must prove to your satisfaction by a fair preponderance of the evidence that Kelly was in fact authorized to make a preliminary contract of insurance in behalf of the defendant which would cover the interval between the giving of the application and the acceptance or rejection of it by the company, and must also prove that he did exercise that authority.

"If Kelly was not, in fact, authorized by the defendant to make such a preliminary contract then there is no liability in this action." And further: "The New Brunswick Company must have

intended Kelly to have such authority, or it must be one which was necessary for the carrying out of an authorized transaction of [its] business."

This portion of the court's charge raises the determinative question here: Does the evidence justify the jury's finding that Kelly spoke for defendant when he dealt with plaintiff? And this necessarily involves the further question of whether his employment by Schacht placed him in the latter's position in dealing with the public.

That Kelly has proved himself an unfaithful servant cannot be denied. Neither Schacht nor defendant received a single dollar of the money plaintiff paid him. Who is to bear the resulting loss, plaintiff or defendant?

■ Defendant, like any other corporation, is only "an artificial person, created by law, or under authority of law, from a group or succession of natural persons, as a distinct legal entity, with rights and liabilities independent of such persons," i. e., "a legal entity distinct from the natural persons composing it." 2 Dunnell, Dig. & Supp. § 1969, and cases under notes 45 and 46. So it naturally must follow that if it is to function at all in its chosen or granted field of operation, it must act through or by means of human direction. It is impotent otherwise.

■ That Schacht was an authorized agent for defendant cannot be doubted. And the jury could well find from the facts recited that Kelly was his agent at Rochester. He was so listed by Schacht, and his dealings with the public confirm that view. Defendant's knowledge of Kelly's connection with Schacht is shown by the correspondence and other facts already recited. Also, as pointing in that direction, there is the following incident which occurred during the course of the trial.

"The Court: Doesn't Schacht have authority to employ solicitors, clerks and others? Is that denied?

"Mr. Clemens: No, I don't think that would be denied, but the employment wouldn't *necessarily* be the employment of the New Brunswick." (Italics supplied.)

In this situation, we think the generally accepted rule is that Schacht as such agent had implied authority to appoint such clerks, assistants, and subagents as were deemed necessary for the proper and efficient transaction of his own and defendant's business. Both were engaged in a common and mutually beneficial enterprise. Their profits rested upon mutuality of effort—as to Schacht, in getting business for his insurance companies; as to the insurers, for the premiums thereby to be earned.

As pointed out in Vance, Insurance (2 ed.) pp. 426, 428, §§ 120, 122, under the title "Subagents—Their Appointment and Powers":

"Where a general agent is appointed to conduct the business of an insurance company throughout a considerable territory, the company must know that the duties of the agent can only be properly discharged if he appoints subagents to solicit insurance and attend to the business incident thereto within certain districts or subdivisions of the territory assigned to the agent. In such a case the act of the subagent appointed is binding upon the company, to the same extent as if he owed his appointment to the company itself and not to the agent."

Many supporting cases are found under note 80.

Nor can we close our eyes to the well known fact that it is a general custom of insurance companies to permit such subagents to act as solicitors for insurance coverage. And as long as such subagents act within the scope of the appointing agent's authority they bind the company they represent. A well reasoned case is Goode & Co. v. Georgia Home Ins. Co. 92 Va. 392, 395, 23 S. E. 744, 745, 30 L. R. A. 842, 53 A. S. R. 817, where the court said:

"Insurance companies know, or ought to know, when they appoint general agents, that, according to the ordinary course of business, they have clerks and other persons to assist them, and that their agents in many instances could not transact the business entrusted to them if they were required to give their personal attention to all of its details. It being necessary, therefore, and according to the usual course of business, for their agents to em-

ploy others to aid them in doing the work, it is just and reasonable that insurance companies should be held responsible not only for the acts of their agents, but also for the acts of their agents' employees, within the scope of the agents' authority."

Helpful, too, on this phase are the following texts and cases: 29 Am. Jur., Insurance, p. 120, § 97, and cases cited under notes; 32 C. J., Insurance, p. 1068, [§ 146]e, and cases under note 48; Otte v. Hartford L. Ins. Co. 88 Minn. 423, 428, 429, 93 N. W. 608, 97 A. S. R. 532; Bodine v. Exchange F. Ins. Co. 51 N. Y. 117, 10 Am. R. 566; Arff v. Star F. Ins. Co. 125 N. Y. 57, 25 N. E. 1073, 10 L. R. A. 609, 21 A. S. R. 721. In Pastucha v. Roth, 290 Mich. 1, 11, 287 N. W. 355, 359, the court, quoting from one of its prior opinions, said:

"Insurance agents generally transact their business by and through employees, and when they do so the acts of these employees are as binding upon the insurance company as though done by the agents themselves."

Next, defendant asserts that neither Schacht nor Neely had "authority to bind" it on a farm risk, since the company rule is that an application must first be written and, if approved by Neely, its state general agent, must then be submitted to defendant's Chicago office, as a result of which, if the application is there accepted, a contract of insurance results. And further, on this phase, the claim is made that, since Kelly was not licensed by the state insurance department as its agent, he was without either specific or implied authority to solicit and procure applications for insurance, citing in support thereof Minn. St. 1941, § 60.64 (Mason St. 1927, § 3348).

■ As to the first ground, we think Koivisto v. Bankers & Merchants F. Ins. Co. 148 Minn. 255, 181 N. W. 580, furnishes an adequate solution. There, too, the local agent's lack of "authority to bind" was as vigorously urged as is Schacht's here. The agent there had taken an application for insurance, and, being authorized to accept premiums and deliver policies, his authority as such

to make a present contract for insurance was sustained. As the court pointed out, insurance agents (148 Minn. 258, 259, 181 N. W. 582) are supplied with "printed blanks." They are stimulated by promises of "liberal commissions," and are sent "abroad to solicit insurance." "Those who apply for it [insurance] rarely know anything about the general officers of the companies, but look to the agents as their full and complete representatives." And since the court "may not close" its eyes to the obvious fact "that the local agent of an insurance company is the medium through whom the business of making insurance contracts is usually carried on," and that they as "such agents frequently make parol contracts for present insurance, * * * such contracts, if within the scope of the agent's authority, are perfectly valid." Here Kelly, as Schacht's agent at Rochester, had authority to solicit and secure applications for farm insurance, collect premiums, and deliver the policies when issued. In the circumstances related, we think the oral contract between Kelly and plaintiff, as in the Koivisto case, "served substantially the same purpose as a binding slip."

■ Here, too, as in that case (148 Minn. 260, 181 N. W. 582):

"It is not important whether we call his [Kelly's] authority apparent or implied. Apparent authority is not actual authority. Implied authority is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess. It includes all such things as are directly connected with and essential to the business in hand."

It is interesting to note that the application blanks furnished by defendant to Kelly have on them a space for the solicitor to insert the date on which the policy was to become effective. And there is ample evidence that it was a recognized practice to date the policies as of the date of the application. Furthermore, as we have seen in this particular case, when Neely on February 26, 1941, sent the February 22 application to Chicago, he wrote that he "would greatly appreciate it if you would issue the policy for a

three year period beginning February 22, 1941." (Defendant's exhibit F.)

■ As to the second point, *i. e.*, that the statute, Minn. St. 1941, § 60.02, subds. 9, 10 (§ 3348), is a bar to Kelly's employment as a subagent of Schacht, this should be said: That section defines "an 'insurance agent'" as "a person acting under express authority from an insurer"; and "an 'insurance solicitor'" as "a person acting under express authority from an insurance agent." As to both classes, the statute, *Id.* § 60.64 (§ 3348), provides that "no person shall act or assume to act * * * until such person shall obtain from the commissioner a license therefor."

As to Schacht, there is no doubt of his qualification to act under this section. As to Kelly, it is equally clear that he had no "express" authority from either Schacht or defendant. But does that exonerate either of them from the liability both have incurred to the public with whom they dealt through Kelly, especially this plaintiff? Since Schacht had clothed Kelly with at least apparent authority and since defendant supplied Kelly with needed blanks to be used in taking applications for this type of insurance, we think the statute may not be invoked by either of them to defeat plaintiff's loss. Furthermore, the statute by its own terms limits its operative field to "express authority."

In Milwaukee Bedding Co. v. Graebner, 182 Wis. 171, 179, 180, 196 N. W. 533, 536, a similar question to the one we are considering was determined by the court. There a statute had been adopted providing:

"No fire insurance company * * * shall make, issue, use or deliver for use any fire insurance policy on property in this state, other than such as shall conform in all particulars as to blanks, size of type, context, provisions, agreements and conditions with the printed forms of contract or policy so filed in the office of the commissioner of insurance."

The court, in considering and determining whether this statute did away with oral contracts of fire insurance, said this:

"We cannot ignore the fact, however, that in the business and insurance world oral contracts of fire insurance have been and are very prevalent. It is customary for business men to call up their insurance agent and place their order for fire insurance. It is considered by both parties that the coverage dates from the time when the insurance agent accepts the application."

Continuing, the court said:

"It would operate as a serious disturbance of settled notions, as well as of the manner in which fire insurance business is conducted, to hold that the insured was without protection until the written policy was issued or delivered."

■ Defendant also inquires: Since Kelly and Schacht represented many insurance companies and since "the evidence discloses that no [particular] insurance company was mentioned at the time the alleged oral contract was made, how could there be a meeting of minds?"

"It is a general rule," said the court in Milwaukee Bedding Co. v. Graebner, 182 Wis. 171, 180-181, 196 N. W. 533, 536-537, "that where an application for insurance is made to an agent who represents several companies, no contract of insurance is engendered between the insured and any particular company until such com-pany is designated by the agent. [Citing cases.] But where the company is selected by the agent and in some manner designated as the company in which the insurance is to be written, a binding contract results." (Citing cases.)

The following authorities in addition to those cited by the court are helpful: 29 Am. Jur., Insurance, pp. 146, 147, § 130; Vance, Insurance (2 ed.) pp. 426, 428, 429, §§ 120-122, and cases under notes 82 and 83; Todd v. German American Ins. Co. 2 Ga. App. 789, 59 S. E. 94; Bales v. General Ins. Co. 53 Idaho 327, 24 P. (2d) 57; Wilson v. German American Ins. Co. 90 Kan. 355, 133 P. 715.

In this case defendant is the only company which received a formal application for insurance. Kelly testified, and there is

other testimony to support him, that the two companies he represented wrote this class of insurance only in exceptional cases, and that inquiry to the state agent of each brought a negative answer. The designation of defendant as the actual insurer is, upon the evidence here presented, adequate to sustain the verdict.

■ Defendant also urges that oral contracts for present insurance are in their very nature and purpose only temporary, and that there is no reported case in which recovery has been sustained where such a long time has elapsed as here between the application for insurance and the time of loss. Defendant points to the fact that in July 1940 Neely wrote to Schacht, "Attention: P. T. [F.] Kelly," returning the application and stating that there would be no insurance coverage unless and until a proper application was forthcoming. But the fatal defect with this contention is that this information was never communicated to plaintiff. Since defendant necessarily could deal only with the public and this plaintiff through its agents and representatives, it follows that any letter or other communication between its own agents, without notice to the one entitled to receive it, was but a futile gesture, a thing of no more force or value, as notice to plaintiff, than if Neely had talked to himself about it. As stated in the Koivisto case, defendant failed to heed the plain requirement that (148 Minn. 259, 181 N. W. 582):

"* * * *until it [the policy] was issued or the application was rejected and the applicant notified* so that he [the applicant] would have an opportunity to get insurance elsewhere, * * * it should be presumed * * * that defendant intended that its agent should have power to provide for the protection of the applicant by a contract." (Italics supplied.)

Nor may liability be avoided because defendant made or permitted a bad choice of agents. Insurance companies are especially well equipped to select competent and trustworthy agents and representatives. Their business is that of underwriting risks and, properly, of charging adequate compensation for assuming such

risks. Their principal means of satisfying the profit motive upon which private enterprise depends could not be accomplished otherwise. Agency established, the loss must fall upon the one the agent represented.

■ Error is charged because the court permitted plaintiff to amend her complaint to conform to the proof in respect to increasing the insurance coverage on the dwelling house from $5,000, as alleged in the complaint, to $6,000. We think this was clearly a matter within the discretion of the court. It brought no new issue into the field of litigation. The complaint alleged the reasonable value of the dwelling house to be $8,000, and that allegation the answer admitted.

■ As to the claimed excessiveness of the $7,000 verdict to the extent of $1,000, this may be said: The evidence showed that plaintiff lost her house and all its contents except a few items of household goods removed from the first floor before the fire reached a stage where further salvage was impossible. Apparently these items were of such limited worth that defendant did not even seek to show their value. As to the household goods, the complaint alleged their value at $3,000 at the time the oral insurance agreement was made. That value, too, was admitted by the answer. We think the jury could reasonably conclude that plaintiff's loss of her household effects was at least that much.

Order affirmed.