BERNICE NEHRING v. M. DALE BAST,
d.b.a. BAST STANDARD SERVICE STATION, AND ANOTHER.
AUTO OWNERS INSURANCE COMPANY, RELATOR.

103 N. W. (2d) 368.

June 3, 1960—No. 37,890.

194

*McLeod & Gilmore,* for relator.
*Francis X. Helgesen,* for respondent employer.

Murphy, Justice.

This case is before us on certiorari from a decision of the Industrial Commission affirming findings and determination of the referee awarding to Bernice Nehring, surviving spouse of Elvin R. Nehring, compensation as a result of accidental death which occurred in the course of her husband's employment by M. Dale Bast, doing business as Bast Standard Service Station at Paynesville, Minnesota.

The sole question presented is whether the employer was insured for compensation liability by the Auto Owners Insurance Company on the

date when the fatal accident occurred. It is agreed that no written policy was in force at that time. The commission held on the facts hereinafter related that there was in force an oral contract to insure, entered into between the insurer by its agent and the employer, which imposes liability for compensation benefits.

It appears from the record that the deceased was employed by Bast on July 11, 1957. While he was engaged in changing a truck tire a snap ring blew off striking him in the skull, fatally injuring him. After notifying Clifford Heitke, the local agent of the Auto Owners Insurance Company, Bast learned that no written workmen's compensation policy was in existence. From the record it appears that since about 1953 Heitke took care of most of Bast's insurance business. A workmen's compensation policy was first issued to Bast by Auto Owners Insurance Company effective April 1, 1953. This policy was renewed for the period April 1, 1954, to April 1, 1955. It is undisputed that there was an agreement between Heitke and Bast that the policy would be automatically renewed until such time as cancellation would be requested by Bast.[1] Bast assumed that on April 1, 1955, Heitke had again renewed the policy. He also assumed that in the subsequent years beginning April 1, 1956, and April 1, 1957, Heitke had again renewed these policies. During this period from 1953 to 1957 Bast testified that he insured through Heitke's agency for "workmen's compensation, garage liability, my home insurance, fire insurance. I have a personal property floater, sporting goods, boats and motors and guns, and so forth, polio policy, collision insurance for my personal automobile, collision insurance for my wrecker, comprehensive insurance for all the vehicles. Liability policies which are covered—I mean for the truck and cars under the garage liability plan." Bast's fire insurance on contents of his station and on lake property which he owned was carried through another agency. Bast testified that

---

[1]No issue has been raised by the briefs or argument as to the application of the statute of frauds. We assume that the parties concede that an agreement to the effect that, until notice by either party to the other, the policy shall be renewed from year to year is not within the statute of frauds. 37 C. J. S., Statute of Frauds, § 65; Annotations, 15 A. L. R. 1020, 69 A. L. R. 573, and 92 A. L. R. 239.

he had an open account with the agent Heitke. There was this further testimony:

"Q. Now, when you purchased—originally purchased your workmen's compensation and employer liability policy from Mr. Heitke, was there any agreement, oral or written, with regard to the renewals of that policy?

"A. Definitely.

"Q. What was that agreement?

"A. That the policy should automatically be renewed up until such time that I should ask him to cancel the policy.

"Q. Have you at any time from the date of your original purchase of the policy and the date of your agreement you just referred to until the present time made any request, either oral or written, to Cliff's Agency for the cancellation of your employer liability policy?

"A. I have not."

With reference to the agreement to renew there was this testimony by Heitke, the agent:

"Q. At the time you first sold workmen's compensation insurance to Mr. Bast did you have any agreement relative—oral or written with him with respect to the renewals of his workmen's compensation policy?

"A. Yes, sir. There were—my agreement with my policy holders, including Dale Bast, is to keep their insurance renewed until they advise me to cancel it out.

"Q. Have you at any time since the issuance of the first policy to Mr. Bast received any notification from him to cancel his workmen's compensation policy?

"A. No, sir.

                *    *    *    *    *

"Q. Mr. Heitke, between April of 1954 and July 11th of 1957 did you personally on any occasions discuss with M. Dale Bast, who is operating Bast Standard Service Station at Paynesville the question whether or not he had workmen's compensation liability insurance coverage?

"A. No, sir. As far as I was concerned he had workmen's com-

pensation that had been renewed with Auto Owners and was in full force at the time.

"Q. It was your understanding that between those dates, including July 11, 1957, he was covered for workmen's compensation liability insurance?

"A. Yes, sir."

It appears from the evidence that the Auto Owners Insurance Company has a system for renewal of workmen's compensation policies which is different from that of most companies. They furnish their local agent with three copies of the policy, one for the policyholder, the second for the agent to retain in his files, and the third to be used as a renewal application to be retained by the agent and sent to the home office at the end of the policy year. This was the only renewal system that Heitke had in his office with regard to Auto Owners Insurance Company, and he relied upon the initiative of his employee to send the application to the company for renewal. He believed that at the end of each policy period Bast's policy had been automatically renewed.

The record indicates that in fact the renewal application was sent in to the insurance company prior to March 30, 1955. The company contends that upon receipt of the application its underwriter wrote to the agent on March 30, 1955, advising him that a review of the coverage indicated that the loss ratio experienced up to that time was too great. The letter went on to say:

*"We request, therefore, that you make other arrangements* for the renewal of this exposure after April 1st.

"In reviewing other coverage we have on this operation, we find that the garage liability policy under number 8036 091255 D was recently renewed and on which it was necessary to apply a ten percent debit to the rates. *If you would like to cancel that policy* in order to place the entire line with another carrier, we would oblige by allowing a pro-rata refund on the minimum premium." (Italics supplied.)

The agent testified that he did not recall receiving this letter. In any event the insured did not receive notice either from the company or from its agent that the policy would not be renewed.

It appears that as other policies of insurance expired the agent would send the renewals and a premium statement to Bast after which he would make payment. Following the expiration of the last written policy on April 1, 1955, Bast received no written policies nor did he pay premiums for workmen's compensation.

The company contends that under its contract the agent, Heitke, was authorized only "to solicit and secure applications" for certain classes of insurance, for which he was to be compensated by specified commissions set forth in the contract, and that he had no authority to enter into a parol agreement for the renewal of policies issued by it. It relies on numerous authorities which have held that a mere soliciting agent is without authority to bind an insurance company by a renewal or agreement to renew. 44 C. J. S., Insurance, § 284; Bridges v. St. Paul F. & M. Ins. Co. 102 Neb. 316, 167 N. W. 64, L. R. A. 1918D, 1199; Dohlin v. Dwelling House Mutual Ins. Co. 122 Neb. 47, 238 N. W. 921; Heisley v. Allied American Mutual Fire Ins. Co. 71 Ga. App. 107, 30 S. E. (2d) 285; St. Paul F. & M. Ins. Co. v. Trustees of Christian Church, 259 Ky. 276, 82 S. W. (2d) 315; Struzewski v. Farmers' Fire Ins. Co. 226 N. Y. 338, 123 N. E. 661; Wood v. Prussian Nat. Ins. Co. 99 Wis. 497, 75 N. W. 173.

In considering the issue as to the authority of the agent to bind his company it may be observed generally that an agent's authority is not limited to the written contract where the company encourages or permits the agent to exercise powers outside his written authority and has induced the public to rely on his authority so enlarged. In such cases the agent's acts as to the insured are the same as if the agent had special permission from the company so to act. In Massachusetts Bonding & Ins. Co. v. R. E. Parsons Elec. Co. (8 Cir.) 61 F. (2d) 264, 268, 92 A. L. R. 218, 225, the following rule was approved:

"* * * Though the powers of an agent may be limited by definite restrictions on his authority and by the nature of his agency, the determination of his powers and consequently the rights of the insured must rest in the first instance on the general principle that the powers of an agent are prima facie coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the per-

son with whom he deals. The real question is not what power the agent has, but what power the company has held him out as having."

■ It is generally recognized that powers specifically granted to the agent carry with them by implication such other and incidental powers as are directly appropriate to the specific powers granted. 2 Couch, Cyclopedia of Insurance Law, § 515. While it is true that in the case before us the contract authorized the agent only to solicit and secure applications, the limitation expressed in the contract was not communicated to the public. The record here indicates that the agent had possession and use of renewal applications which did not require the signature of the insured. He was provided with company letterheads and advertising material upon which his name was printed representing him to be the agent of the company in the locality. He was authorized to secure applications, collect premiums, and deliver policies when issued. It is not disputed that it was his practice to enter into oral contracts in behalf of the company for preliminary insurance. In discussing the subject of apparent authority of insurance agents, Mr. Justice Mitchell in Kausal v. Minnesota Farmers' Mutual Fire Ins. Assn. 31 Minn. 17, 21, 16 N. W. 430, observed that companies "supply these agents with printed blanks, stimulate them by the promise of liberal commissions, and then send them abroad in the community to solicit insurance." He further pointed out that those who apply for insurance rarely know anything about the company but look to the agent upon whom they rely as its representative, and that they have a perfect right to do so in view of the apparent authority with which the companies clothe their agents. In Koivisto v. Bankers & Merchants Fire Ins. Co. 148 Minn. 255, 258, 181 N. W. 580, 582, Mr. Justice Lees emphasized that the public at large is not bound by the restrictions contained in an agency contract and noted that:

"We may not close our eyes to the fact that the local agent of an insurance company is the medium through whom the business of making insurance contracts is usually carried on. Such agents frequently make parol contracts for present insurance, and such contracts, if within the scope of the agent's authority, are perfectly valid."

The authority most often quoted on this subject is Schmidt v. Agricultural Ins. Co. 190 Minn. 585, 252 N. W. 671. In that case, although the agent agreed to renew a policy upon the request of the insured to "go ahead and write it up again," he failed to do so. About 6 months after the policy expired a loss occurred. It was held that the company was liable on the oral contract to renew.[2] We there said that no particular form of renewal contract is necessary. To constitute an oral contract of renewal no particular words need to be used, it being sufficient if it appears that it was the intention of the parties in fact to continue or extend the existing insurance. Rommel v. New Brunswick Fire Ins. Co. 214 Minn. 251, 8 N. W. (2d) 28, is equally persuasive. In that case the loss occurred 6 months after the expiration of the policy for which there was held to be an oral contract to renew. In that decision Mr. Justice Olson emphasized the statement contained in the Koivisto case that (214 Minn. 264, 8 N. W. [2d] 35):

"* * * *until it* [*the policy*] *was issued or the application was rejected and the applicant notified* so that he [the applicant] would have an opportunity to get insurance elsewhere, * * * it should be presumed * * * that defendant intended that its agent should have power to provide for the protection of the applicant by a contract."

■ The obvious difficulty in applying the foregoing authorities to the facts in the case before us arises from the circumstance that a period of 2 years and 2 months passed between the expiration of the last written policy and the date of the accident. In considering the application of these authorities it must be conceded at the outset that the employer found himself without workmen's compensation insurance because of the negligence of the agent. Both the agent and the employer believed the insurance was in force at the time of the accident. Neither was aware of the fact that a policy was not in force until that fact was brought to their attention by the happening of the accident. In the Rommel and Koivisto cases the underlying principle which imposed liability upon the company was that of equitable estoppel which pre-

---

[2]More recently in Cormican v. Anchor Cas. Co. 249 Minn. 196, 81 N. W. (2d) 782, an oral contract to renew insurance was held valid.

vents the company from denying delegation of authority where the principal has knowledge of the business practices and usages and has acquiesced therein or must be held to have done so.

The facts in the case before us raise the question as to who is to suffer for the negligence of the agent—the company or the employer. It is well recognized that "wherever one of two innocent persons must suffer by the acts of a third, he who by his conduct, act, or omission has enabled such third person to occasion the loss must sustain it." 31 C. J. S., Estoppel, § 103; 44 C. J. S., Insurance, § 284; 29A Am. Jur., Insurance, § 1049; Stillson v. Prudential Ins. Co. 202 Ga. 79, 42 S. E. (2d) 121; Rommel v. New Brunswick Fire Ins. Co. *supra.* This rule has been applied to cases where the third person, whose act or default has occasioned the loss, has been in some sense or to some extent the agent of the party who is made to sustain the loss or when the latter by his acts or negligence has authorized the other party to consider him as such. Fahlbusch v. Consumers Discount Corp. 159 Misc. 568, 288 N. Y. S. 511; Fifth St. Bldg. & Loan Assn. v. Kornfeld, 315 Pa. 406, 172 A. 703; First Nat. Bank v. Aler, 92 W. Va. 313, 114 S. E. 745; 31 C. J. S., Estoppel, § 103.

■ Because we are concerned here with workmen's compensation insurance, there are strong reasons why the foregoing authorities must have application to the facts before us. With certain exceptions the Workmen's Compensation Act requires every employer to carry compensation insurance. The compulsory insurance feature of the compensation act comprehends continuous coverage. A policy may not be cancelled by the insurer without 30 days' written notice mailed to the insured by registered return receipt mail. M. S. A. 176.185, subd. 1. Moreover, the statutes provide for coverage of rejected risks. §§ 79.11; 79.12; 79.24; 79.25. The object of the Compensation Insurance Bureau is to provide insurance of all compensation risks in solvent carriers for the protection of the employer, employee, and the public. Hurley v. Chaffee, 231 Minn. 362, 43 N. W. (2d) 281. The employer here was never informed that he was a rejected risk. Had he been notified of that fact, he would have been able to secure insurance elsewhere either through a different company or by action of the Compensation Insur-

ance Bureau which, pursuant to § 79.25, is charged with the obligation of providing coverage for workmen's compensation risks rejected by compensation insurers.

■ We think it is clear from the facts in this case that the failure of the insured to have a written policy may be attributed to the negligence of the company and its agent. It is undisputed that in the latter part of March 1955 the agent sent to the company an application for renewal. While it is claimed that the company wrote a letter in which it made the "request" that the insurance be placed elsewhere by the agent, it appears from the findings of the commission that there was no unequivocal denial of the application. It is undisputed that after the application was received the only communication the company had with the employer was to send him or the agent a bill in June 1955 for an additional premium and subsequently, probably sometime in the spring of 1956, to inform him through the agent that his garage liability policy had been cancelled. The company gave the insured no notice of its failure to renew the workmen's compensation policy nor did it thereafter inquire of the agent what action, if any, he had taken to place the insurance elsewhere. But assuming the letter was written by the insurance company to its agent, it could not be expected that the agent would have an opportunity in the time allowed to secure another insurer to provide coverage until a new policy could be secured. It is our view that when the company received the application for renewal about March 30, 1955, it was bound by the agent's oral contract for insurance at least until such time as it was accepted or categorically rejected.

Nor can it be said that the company may avoid liability because of the negligence of its agent. In Massachusetts Bonding & Ins. Co. v. R. E. Parsons Elec. Co. (8 Cir.) 61 F. (2d) 264, 272, 92 A. L. R. 218, 232, Judge Nordbye said:

"* * * The exigencies of modern business require and justify reliance on oral agreements of insurance entered into by agents acting with apparent authority."

And in Rommel v. New Brunswick Fire Ins. Co. 214 Minn. 251, 264, 8 N. W. (2d) 28, 35, Mr. Justice Olson said:

"Nor may liability be avoided because defendant made or permitted a bad choice of agents. Insurance companies are especially well equipped to select competent and trustworthy agents and representatives. Their business is that of underwriting risks and, properly, of charging adequate compensation for assuming such risks. Their principal means of satisfying the profit motive upon which private enterprise depends could not be accomplished otherwise. Agency established, the loss must fall upon the one the agent represented."

Before it can be said, however, that the company may be estopped to deny its liability for the acts of an agent whom it has clothed with apparent authority it must appear that the insured was justified in acting as he did and that his conduct was that of a person of ordinarily careful and prudent business habits who was led to believe that the agent possessed the authority which he exercised. The company stresses the fact that the employer found himself without coverage because of his own fault and is not entitled to the benefit of principles of equity. He had not received workmen's compensation policies during the period in question nor had he been billed for premiums. It argues that in assuming without justification that he was insured, the employer improvidently ignored elementary rules of ordinary business practice. The employer on the other hand points out that in the interval between April 1, 1955, the date of the last application for renewal, and July 11, 1957, the date of the accident, he had been led to believe by the acts and conduct of the agent that his workmen's compensation insurance was in force. During this interval the other policies carried with the agency were automatically renewed, the premiums were charged to the employer's open account, and payment therefor was duly made. The employer assumed that the renewals for workmen's compensation were part of this series of transactions. Being a filling station operator, he argues, he was not familiar with the distinctions between various types of policies and the technical provisions contained in them. His claim—that the insurance policy is a formidable document, the provisions of which the purchaser usually learns from a summary statement of the agent rather than from an examination of the policy itself—is not without merit. He also maintains if he failed to identify each policy as

he received it, it was because he had been disarmed and relied upon the agent's word that the policies he originally purchased would be renewed.

We think it was a question of fact as to whether the employer acted under the circumstances as a person of ordinarily careful and prudent business habits. In determining whether the evidence and the reasonable inferences to be drawn therefrom sustain the findings of the commission, the record must be viewed in the light most favorable to such findings. 21 Dunnell, Dig. (3 ed.) § 10426; Schmoll v. J. W. Craig Co. 228 Minn. 429, 37 N. W. (2d) 539. Where, as here, the findings of the commission are based upon conflicting evidence and diverse inferences, a situation is presented on which reasonable minds might disagree. This being the case, we are not at liberty to disturb the findings of the commission. Schmoll v. J. W. Craig Co. *supra.* We have many times said that in reviewing the decisions of the Industrial Commission it is the function of this court to determine whether the evidence is such that the commission might reasonably have come to the conclusion which it did and, if so, findings of the commission will not be disturbed unless they are manifestly contrary to the evidence or unless consideration of the evidence and inferences permissible therefrom would clearly require reasonable minds to adopt a contrary conclusion. Torrey v. Midland Cooperatives, Inc. 253 Minn. 489, 93 N. W. (2d) 135.

In view of the foregoing discussion it is not necessary to pass upon other issues raised by the briefs.

Affirmed.

MR. JUSTICE LOEVINGER, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.