## ST. PAUL FIRE & MARINE INSURANCE COMPANY v. ROBERT BIERWERTH AND OTHERS.

175 N. W. (2d) 136.

December 12, 1969—Nos. 41741, 41817.

*Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne,* and *O. C. Adamson II,* for appellant.

*Barna & Guzy, Robert C. Hynes,* and *Gordon L. Jensen,* for respondent Paulus.

*Moonan, Fitzgerald, Castor, Fitzgerald & Stich* and *Robert T. Stich,* for respondent Stroschein.

*Cochrane & Bresnahan,* for respondent Bierwerth.

Heard before Knutson, C. J., and Nelson, Sheran, Peterson, and Frank T. Gallagher, JJ.

NELSON, JUSTICE.

Plaintiff-appellant, St. Paul Fire and Marine Insurance Company, brought this action for a declaratory judgment against defendants-respondents, Robert Bierwerth, Robert Dwayne Stroschein, Jr., and Douglas Michael Paulus, to establish the respective rights and liabilities of the parties with respect to a contract of automobile liability insurance.

The trial court ruled that the contract of insurance under which plaintiff insured defendant Paulus was in effect January 15, 1966, and that plaintiff has the duty of defending Paulus in legal actions arising out of an accident which occurred on that date. The court also awarded Paulus attorney's fees of $1,000 incurred in the declaratory action. Plaintiff appealed from an order denying its motion for amended findings or a new trial and also from the judgment entered on December 20, 1968.

In October 1958 Paulus procured a policy of automobile liability insurance through one Percy Brown, then owner of the Tabour Insurance Agency, on a recently purchased 1958 Chevrolet Impala automobile, said policy being issued by plaintiff on October 18, 1958. The policy was renewed annually the succeeding 5 years through October 18, 1963.

On August 15, 1964, Paulus sold his Chevrolet Impala. That same day he called the Tabour Agency, informing Percy Brown's widow that he had sold his car and asking about a return of premium for the unexpired portion of the policy period. Mrs. Brown responded that there would be little or nothing payable as a premium return on cancellation and mentioned the possibility of Paulus' acquiring another automobile. Paulus had not purchased a replacement car and he did not know if or when he

would do so. Mrs. Brown told Paulus she would have an agent call on him, but none did.

Paulus testified that on Saturday, October 17, 1964, one Richard Wood brought a 1956 Buick to the Paulus home and that after inspection Paulus decided to buy the car. However, Wood did not turn the car and bill of sale over to Paulus until the following Monday. A bill of sale and application for transfer of the title registration bearing notarial acknowledgments of the signatures of Wood and Paulus dated October 19, 1964, contained Wood's statement that the date of the sale was October 29, 1964.

After Paulus' telephone conversation with Mrs. Brown on August 15, 1964, he did not speak with anyone connected with the Tabour Agency during the remainder of 1964. In October 1964 he received a statement from the Tabour Agency requesting payment of the annual renewal premium for the automobile insurance on the 1958 Chevrolet which he had sold two months before. Paulus ignored the statement. In November 1964 he made arrangements with Virgil Hanson, an insurance agent, for a policy of automobile liability insurance covering the 1956 Buick. As a result of the agreement with Hanson, American Allied Insurance Company issued its policy of insurance and Paulus paid the premium.

In November 1964 Paulus received a second renewal premium notice from the Tabour Agency for insurance on the 1958 Chevrolet Impala. Paulus ignored this notice also. He received a third notice in December 1964, but again made no response.

In January 1965, after receiving a letter from the Tabour Agency, Paulus requested his wife to call the agency and explain that he had another car and that he was insured with American Allied. He did not instruct Mrs. Paulus to advise the Tabour Agency that the description of the insured automobile should be changed to the 1956 Buick. Paulus did tell his wife to cancel the policy for which the Tabour Agency wanted payment as of January 6, 1965, the date on which she telephoned the agency. David Vaalar, the owner of the Tabour Agency, talked to Mrs.

Paulus when she telephoned. He testified that Mrs. Paulus told him that the 1958 Chevrolet had been sold and the insurance policy returned. Mrs. Paulus testified that she did not return any insurance policy to the Tabour Agency. Vaalar and Mrs. Paulus agreed that the latter wanted the policy canceled immediately because Paulus had disposed of the Chevrolet and had procured insurance elsewhere on the 1956 Buick.

On January 11, 1965, the Tabour Agency informed plaintiff that Paulus had sold the insured car before the beginning of the policy period and directed the company to cancel the policy by direct notice. On January 19, 1965, plaintiff sent Paulus written notice of cancellation to take effect at 12:01 a. m. January 31, 1965. On January 20, 1965, the Tabour Agency wrote Paulus asking for payment of an earned premium of $32.

On January 15, 1965, while driving the 1956 Buick, Paulus was involved in an automobile accident. On January 22 or 23 he sent a check in the amount of $32 to the Tabour Agency and notified the agency of his accident of January 15. The check was cashed.

On February 19, 1965, David B. Orfield, an attorney associated with the firm of Meagher, Geer, Markham & Anderson, who had been engaged by plaintiff to investigate the loss resulting from the accident of January 15 and the question of insurance coverage with respect to that loss, interviewed Paulus and secured a signed statement from him. The lower court refused to admit either the statement or any other evidence of the substance of Orfield's conversation with Paulus on the ground that it was a privileged communication between attorney and client. The court also refused an offer of proof that Orfield identified himself to Paulus as an attorney for plaintiff; that Orfield told Paulus it was doubtful that plaintiff insured him; that Paulus and Orfield entered into a nonwaiver agreement; that Paulus stated that he ordered the Tabour Agency to cancel his policy on August 15, 1964; and that Paulus had said that he bought the 1956 Buick on October 19, 1964.

The statement reveals that Paulus told Mrs. Brown to cancel the policy on August 15, 1964; that he had no further communication with the Tabour Agency; and that when he asked his wife to call the Tabour Agency in January 1965, he instructed her to inform the agency that he had neither requested nor taken out the new insurance for which he was being billed.

On February 22, 1965, Orfield wrote Paulus reminding him that the firm of Meagher, Geer, Markham & Anderson represented plaintiff and informing him that plaintiff denied that it insured him after October 18, 1964. Enclosed were a copy of the signed statement of February 19, 1965, and a draft in the amount of $32 representing a return of the premium paid to the Tabour Agency subsequent to the accident of January 15, 1965.

On July 23, 1965, some 5 months after the conference between Orfield and Paulus, Robert Bierwerth, a passenger in the vehicle which collided with Paulus' Buick, commenced an action against Paulus and the other driver. Meagher, Geer, Markham & Anderson entered an appearance on behalf of Paulus in that action.

On October 11, 1966, the statements of Mr. and Mrs. Paulus, given in response to questions by G. T. MacIntosh, II, an attorney associated with Meagher, Geer, Markham & Anderson, were recorded by Alan Kunde, a court reporter. At trial the court excluded these statements from evidence also, sustaining the objection that they were inadmissible as privileged communication between attorney and client. On the same ground the court also refused to permit any testimony concerning the conversation of October 11 and rejected an offer of proof with respect to the circumstances of the taking of the statements.

Paulus testified that MacIntosh informed him that MacIntosh was an attorney who represented him and that Paulus made the statement to MacIntosh as his lawyer. However, the first remark in the statement of October 11, following the introduction of Kunde to Paulus and the advice that what was said would be written down, is this statement by MacIntosh:

"We are interested primarily here in insurance, and as you

know, I represent St. Paul Fire and Marine regarding this insurance problem that we have."

Before interrogating Mrs. Paulus, MacIntosh told her:

"* * * All we are going to do is I am going to ask you a few questions regarding this insurance transaction, you know, your calls to the Tabour Agency. Like I told your husband, it may be used for you or against you just like anything else you say, I guess, and the whole world. Actually there are some facts here we don't have in our file that your husband now supplied me with. Again it's calculated to determine whether or not there is coverage in this particular case."

In his statement to MacIntosh Paulus asserted that he told Mrs. Brown on August 15, 1964, to terminate his automobile insurance policy and that he did not want any insurance on any automobile, since he probably would not be purchasing another. He also stated that he ignored the October and November premium notices because he had already procured a policy with American Allied through Virgil Hanson and thought he had canceled the policy. Paulus further stated that when he took out the insurance with American Allied, he did not intend to be insured by both plaintiff and American Allied.

Mrs. Paulus said that when she called the Tabour Agency on January 6, 1965, she told them she had no intention of paying any premium when the Pauluses did not own the car and had canceled the insurance. Mrs. Paulus did not tell the Tabour Agency that they wanted the Buick insured. She said her husband did not intend to insure the Buick with plaintiff.

The lower court's findings of fact were essentially that the policy was not canceled on August 15, 1964, and remained in full force and effect until January 31, 1965; that Paulus bought the 1956 Buick on October 17, 1964, during the period of the policy in effect from October 18, 1963, to October 18, 1964, and that under the terms of the policy the Buick was an "owned automobile" and that no notice to plaintiff of the acquisition of the Buick was required; that on October 18, 1964, in accordance with

established practice and custom, the Tabour Agency renewed the insurance policy for the year ending October 18, 1965, and that there was no mutual mistake of a material fact between the parties as to this renewal; that on January 6, 1965, Mrs. Paulus called the Tabour Agency and requested cancellation of the policy, that there was no mutual agreement between the parties as to when the policy was to be canceled, and, there being no mutual agreement, there was no oral cancellation; that in February 1965 Paulus paid a premium of $32 to the Tabour Agency, which negotiated his check; that plaintiff mailed Paulus a draft in that amount, that Paulus has not presented the draft for payment, and that plaintiff received and retained the premium for the period from October 18, 1964, to January 31, 1965.

The court concluded that plaintiff's automobile policy insuring Paulus was in effect to January 31, 1965, and that plaintiff had a duty to undertake the defense of any action arising out of the accident of January 15, 1965, and, in addition, to pay any judgments entered therein against Paulus.

The contention of defendants that at the time of the accident a contract of insurance was in effect between Paulus and plaintiff is based on three grounds: (1) There was mutual assent between the parties to the formation of a contract; (2) plaintiff was estopped from denying the existence of a contract; (3) the Tabour Agency, being a double agent, used its authority to bind both parties. These three contentions will be discussed separately.

1. In Minnesota an oral contract of present insurance is valid, and renewal insurance is governed by the same considerations. A binding renewal contract cannot be effected without the mutual assent of the parties—a meeting of the minds of the parties on all the essentials of the contract—and a new consideration. 43 Am. Jur. (2d) Insurance, § 380. In order to complete a contract, there must be an offer by one party and an unconditional acceptance by the other. Normally, the offer is made by application on the part of the insured, and the acceptance is mani-

fested by delivery of the policy by the insurer. However, the unsolicited issuance of a renewal policy, as in the case at bar, is not an acceptance, but an offer, and a completed contract is not formed until acceptance is expressed by the insured or necessarily inferred from his conduct. In the instant case, since Paulus never requested the renewal policy and never expressly accepted it, if there is to be an effective contract of insurance, its existence must be inferred from the conduct of the parties.

Defendants contend that the policy actually in effect until October 18, 1964, was renewed by the Tabour Agency pursuant to the established custom and practice that existed between the agency and Paulus. They contend that Paulus was entitled to rely upon this established custom and practice, citing in support of their contention Seavey v. Erickson, 244 Minn. 232, 69 N. W. (2d) 889, 52 A. L. R. (2d) 1144. The evidence of custom and practice allegedly relied upon by Paulus is that on October 18, 1958, when he purchased the 1958 Chevrolet Impala he also acquired a liability insurance policy through the Tabour Agency, and that the agency continued to renew the policy annually for six years by advancing the premium each year to plaintiff and then billing Paulus for the annual premium.

However, the conduct of Paulus subsequent to the time he sold his 1958 Chevrolet does not lend support to the idea that Paulus intended a continuation of the insurance with plaintiff. True, there probably was intent on the part of Tabour and plaintiff to enter into a contract, but there must be mutual assent to form a binding contract, and the intent on the part of Paulus was lacking. The facts that on August 15, 1964, Paulus telephoned the Tabour Agency and informed the agent he no longer owned the automobile which was the subject matter of the policy and that he did not know if or when he intended to purchase a replacement therefor; that he suggested cancellation to the agent; that he purchased a liability insurance policy for a new car through a different agency and from a different insurance company, for which policy he paid the premium; and that he ignored the

premium notices sent by Tabour in October, November, and December 1964 all suggest that after he sold the Chevrolet he had no intention of remaining insured with plaintiff. Such breaking of custom disposes of the argument that acceptance is presumed from a mere failure to decline the offer or from a mere delay in rejecting a receipt for renewal of the policy. See, 43 Am. Jur. (2d) Insurance, § 380.

It has been argued that the unsolicited premium notice was an offer which remained outstanding until accepted by Paulus' payment of the $32 earned premium, thereby completing the contract. In cases of this kind, however, the payment of the premium is only one factor to be considered. The ultimate determination of whether the insurance was in effect depends upon all the facts, including the prior course of conduct between the insured and the insurer, as well as the actions of the insured after being notified of the unsolicited renewal of the policy. See, Preferred Risk Ins. Co. v. Central Surety & Ins. Corp. (W. D. Ark.) 191 F. Supp. 797. The absence of present contractual intent on the part of Paulus has already been discussed.

Defendants rely upon Cormican v. Anchor Cas. Co. 249 Minn. 196, 81 N. W. (2d) 782. That case is distinguishable from this one since there the crucial fact of procurement by the insured of insurance with another company was not present as it is here. Furthermore, in Cormican the insured testified that he requested a renewal policy for an additional term, whereas Paulus did not so testify in this case.

Kudrna v. Great Northern Ins. Co. (D. Mont.) 175 F. Supp. 783, seems to be in point. There the defendant insurance company issued an automobile liability insurance policy for the year ending September 5, 1957. On August 29, 1957, its agent sent the insured, Kudrna, a renewal policy, together with a bill for the renewal premium. The insured ignored the premium notice and subsequently procured a similar policy with a different insurance company. After receiving another premium notice, the insured wrote to the agent advising him he did not want the

policy, and he sent him a $10 check, the purpose of which was disputed at trial. The agent wrote back to Kudrna asking for a return of the policy. That same day the insurer canceled the policy without notice to the insured. A week later insured was involved in an accident. The agent sent him a check for $10 but it was not cashed.

The court held that Kudrna never intended to be insured by defendant during the time period in question, and that he did nothing to manifest any intention to accept the insurer's continuing offer of insurance. Rather, he took out a policy of insurance with another insurance company. The court considered the new policy as a replacement policy, since there was no evidence that Kudrna intended to have two policies in effect. Such evidence is similarly lacking here.

The court in Kudrna went on to state that the mere fact that the insurer and the agent assumed that a policy had been accepted and was in effect and that plaintiff assumed he was obligated for a portion of the premium due to his retention of the policy and his failure to notify the agent that he no longer needed it, would not change the rule that there can be no contract without mutual assent.

2-3. Defendants contend that, since Paulus relied upon the representation made to him by the Tabour Agency as agent for plaintiff, the policy would not terminate until January 31, 1965, such reliance allegedly being manifested by Paulus' remittance of $32 for the premium required for that period. Defendants also contend that by accepting the check with knowledge of the accident, plaintiff waived its right to deny coverage. In other words, defendants contend that plaintiff is estopped from denying the existence of the contract. See, Nehring v. Bast, 258 Minn. 193, 103 N. W. (2d) 368, 85 A. L. R. (2d) 1400.

Defendants also contend that the fact that plaintiff sent Paulus a notice of cancellation indicates that a contract was in effect, citing Cormican v. Anchor Cas. Co. 249 Minn. 196, 203,

81 N. W. (2d) 782, 788, to the effect that "[i]t is absurd to give notice of cancellation of a nonexistent contract."

As stated by the court in the Kudrna case, it is questionable whether a contract can be created in the first instance by estoppel. But beyond that, an element necessary to create an equitable estoppel is reliance on the conduct by the other party. Restatement, Contracts, § 90. In the instant case, contrary to defendants' contention, there was no reliance, detrimental or otherwise. Paulus did not refrain from purchasing insurance elsewhere as a result of the conduct of the agent or the company. Rather, he purchased a policy from another agency and paid the premium.

It has also been held in this regard that ministerial acts of an insurance company would not be effective to create a waiver or estoppel. Thus, in Virginia Mutual Ins. Co. v. Insurance Co. of North America (4 Cir.) 383 F. (2d) 6, the court held that conduct by certain insurance companies evincing acknowledgment that their policies were still in effect was not enough to override other circumstances, such as the procurement of new policies by the insured, which indicated that the original policies were effectively canceled. Such conduct included prepayment of the premium by the agent, billing of the insured by the agent, and mailing of a notice canceling the policy effective on a date after the date of the accident. The court explained these acts on the basis of customary office routine rather than deliberate intent to keep the policies in effect. Similarly, we think the like acts of the Tabour Agency and plaintiff were the result of customary office routine.

4. Defendants' final contention is that the established custom which had developed among plaintiff, Paulus, and the Tabour Agency resulted in the agency's becoming a double agent, possessing the authority to bind both plaintiff and Paulus to a contract. See, Hamm Realty Co. v. New Hampshire Fire Ins. Co. 80 Minn. 139, 83 N. W. 41; Id. 84 Minn. 336, 87 N. W. 933.

Defendants argue that remittance of the $32 premium by

Tabour to plaintiff served not only as a consideration but also as an acceptance of the offer on the part of Paulus. Defendants further contend that, even though Paulus did not intend to enter into a renewal contract, the Tabour Agency possessed this intent for him. This latter argument is without merit. An agent is not allowed to go beyond the scope of his authority. Paulus never showed any evidence of intent to be bound. Rather, his conduct in calling the agency on August 15, 1964, and stating that he had sold his car, inquiring about a return premium for the unexpired portion of the policy, and indicating that he wanted his insurance canceled; in procuring a new insurance policy; and in ignoring the premium notices sent him by the agency indicates that he did not intend to continue the principal-agent relationship with the Tabour Agency if in fact there was such a relationship.

Since Paulus' conduct during the period from August 15, 1964, until the time of his accident negates any intention on his part of being insured by plaintiff, it is clear that the mutual assent necessary to the formation of a renewal insurance contract was not present, and plaintiff is not equitably estopped from denying the existence of a contract since Paulus did not rely to his detriment upon the conduct of the insurer.

Since we have ruled that no contract of insurance existed between Paulus and plaintiff after August 15, 1964, there was no attorney-client relationship which could result in the making of privileged communications at the meetings occurring between Mr. and Mrs. Paulus and attorneys Orfield and MacIntosh. See, Knox v. Knox, 222 Minn. 477, 25 N. W. (2d) 225; 58 Am. Jur., Witnesses, §§ 484, 521. However, since plaintiff is entitled to a reversal of the lower court's ruling, it is unnecessary to resort to the testimony which the trial judge excluded on the grounds of attorney-client privilege.

Reversed.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS

On February 20, 1970, the following opinion was filed:

PER CURIAM.

Appellant, St. Paul Fire & Marine Insurance Company, appeals from taxation of costs and disbursements allowed by the clerk December 30, 1969.

Minn. St. 607.01, subd. 1, provides:

"Costs in the supreme court may be allowed, in the discretion of the court, as follows:

"(1) To the prevailing party, upon a judgment in his favor on the merits, not exceeding $25;

"(2) Upon dismissal, not exceeding $10."

Under the discretionary authority conferred by the foregoing statute, the clerk of this court reduced the allowance sought by St. Paul Fire & Marine for printing its brief and appendix from $324.08 to $162.04 and, in addition thereto, allowed statutory costs in the amount of $25, the total allowance being $187.04.

In the instant case, third-party defendants clearly indicated by their answers that they had not commenced any other action to have adjudicated respective rights and liabilities under the policy of insurance issued by plaintiff to defendant Paulus.

Rule 139.05, Rules of Civil Appellate Procedure, provides:

"The clerk, in the first instance, and the Supreme Court upon appeal from the clerk's taxation, or upon its own motion, may disallow the prevailing party's costs or disbursements or both, in whole or in part for a violation of these rules or for other good cause. The prevailing party will not be allowed to tax as a disbursement the cost of reproducing parts of the record in the appendix which are not relevant to the issues on appeal."

This rule is basically the same as Minn. St. 607.01 and 607.02 and Supreme Court Rule XV (222 Minn. xxxvii).

It is our conclusion under all the circumstances herein that the costs as allowed by the clerk of the supreme court should be approved.

Affirmed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.