## DOROTHY HICKORY v. HICKORY INSULATION COMPANY, INC., AND ANOTHER.

134 N. W. (2d) 879.

April 23, 1965—No. 39,444.

*Neville, Johnson & Thompson, Robert D. Stiles,* and *John P. Karalis,* for relator.

*Firestone, Fink, Krawetz, Miley & O'Neill, S. J. Donahoe,* and *Kenneth J. Maas, Jr.,* for respondents.

MURPHY, JUSTICE.

Certiorari to review an order of the Industrial Commission denying compensation for death resulting from rupture and bleeding of a cerebral artery aneurysm which relator contends was work-related so as to require compensation under the Workmen's Compensation Act.

From the record it appears that at the time of his death decedent was 49 years of age. He was employed by an insulating supply company which was engaged in the sale of different types of insulation, including fiberglass, cements, mastics, and other materials. His general duties were described by his superior as—

"* * * his primary function was general superintendent in the sense of going to each job. * * * we might have had five or six operating at a time, and he was responsible for seeing that the jobs were processed and operated properly and he was responsible for seeing that the jobs were supplied with materials, whether he got them there by common carrier or by his Volkswagen and he had charge of the warehouse and he was our truck driver and delivery boy, I guess you might call it, all wrapped up in one."

He worked in a five-story warehouse building and his job involved the handling of materials. He would remove them to the elevator from the place where they were stored on the premises. The elevator opened onto a loading dock, used when materials were delivered by common carrier, and onto an assembly area, used when they were transported by company truck which decedent operated. The materials were boxed or bagged in various types of containers which weighed from 25 to 100 pounds, depending upon the contents. He would lift them in the loading and unloading of the delivery truck.

On the day of the fatal attack, October 17, 1961, he worked alone. When he awoke in the morning, he suffered from a headache. His physical activities were not observed by witnesses during the course of the day. He was first seen in the morning about 7:45 delivering an order to a customer and was next seen at noon at the office, where he complained of a severe headache. His activities during the day were reconstructed from job or sale orders which indicated that he had handled various cartons and packages, the accumulated weight of which was estimated at about 2,000 pounds. At about 3:30 p. m. he entered his employer's office and was informed that there were other orders to be assembled for freight shipment. He assembled at least two, the weight of which was over 1,000 pounds, and returned to the office about 45 minutes later. After resting a few minutes, he went to the bathroom where he collapsed on the floor. He was taken to the hospital where he died October 20, 1961. It was agreed that his death resulted from a recent rupture of a cerebral artery aneurysm; hemorrhagic encephalomalacia in the right frontal lobe; diffuse subarachnoid bleeding; and terminal pulmonary congestion. The referee found:

"That the employe's death did not result from a personal injury arising out of the employment, nor was it related to the employment in any manner due to causation, aggravation or acceleration."

The commission affirmed, one commissioner dissenting. In determining that the attack was not work-connected, the majority was of the view that the deceased experienced no symptoms of difficulty while performing his work the day he became ill; that there was no evidence to support an assumption of great stress; and that relator's medical expert's assumption of physical or emotional stress which might bring about the rupture was speculative. Although decedent complained of headaches in the morning and at noon, the majority felt that it would be speculative to say that the work contributed to the rupture of the aneurysm. One of the commissioners was persuaded by medical evidence to the effect that since decedent awoke with a headache which persisted throughout the day, and which indicated the rupture had taken place before work commenced, death would have resulted in any event, regardless of his activity. The dissent, which is not entirely without persuasive force, emphasized the considerable amount of physical exertion expended by decedent during the day and the asserted untrustworthiness of respondents' medical testimony.

We have carefully considered the record and the great number of authorities presented in relator's interesting and competent brief. We are nevertheless constrained to hold that the issue presented is one of fact which the commission has resolved, and we are not at liberty to disturb it. There is evidence and reasonable inferences in the record to support the commission's determination.

Relator's medical expert described the aneurysm as a dilation or bulging in the wall of a blood vessel or artery which he said—

"* * * [w]e can compare * * * to a weakened balloon or tire in which this bulging of this balloon or tire is present for quite a long time."

It is a condition difficult to diagnose and often is not found until surgery is performed or at an autopsy. Very few physicians are able to diagnose it in advance for the reason that it is usually dormant

and the symptoms unfortunately result in death when it does explode and tear. Relator's medical expert testified that in his opinion—

"* * * the tear probably occurred during that day of admission to the hospital while at work because, as explained, with the headache at noon and then collapsing at 4:00 P.M. * * * [would indicate] that the seepage of blood and the leaking of the aneurysm was proceeding during this time and creating symptoms and activity at this time would be increasing the amount of bleeding and substantially contributing to the damage that was being done in his brain."

He concluded that the work activity of decedent "would increase the pressure inside of the vessel and tend to cause it to more likely to rupture." But there was other testimony by relator's expert which might indicate that his conclusion that the work activity brought about the rupture was speculative. He conceded that the rupture may have occurred in the morning when decedent complained of a headache. After testifying that the rupture of the aneurysm and the headache may have coincided, he conceded that decedent's complaint of a headache at or about noon of that day would indicate increasing or continuing difficulty. He stated that in view of the autopsy, the fact decedent had a headache in the morning might indicate "[p]robably beginning bleeding, early bleeding." He testified further:

"Q.  And that bleeding presumably would continue to the point until it caused Mr. Hickory to collapse, is that right?

"A.  I would think so.

"Q.  Because of the pressure exerted by the bleeding against the brain and so forth?

"A.  Because of—

"Q.  Of the pressure resulting from the released blood against the brain?

"A.  Yes, with damage of surrounding tissues."

As opposed to the testimony of relator's medical expert, the evidence in behalf of respondents is that the work performed by the decedent did not contribute to his death. The internist who testified for respondents was of the view that the aneurysm was a probable congenital

condition which might result in a fatal hemorrhage regardless of the activity in which decedent might engage. He said:

"The aneurysm hemorrhages on the brain are generally of two kinds. One is an intracerebral hemorrhage, that's the usual stroke that we talk about in which the hemorrhage comes from certain blood vessels that supply the brain tissue. The subarachnoid hemorrhages are entirely different. They occur outside the brain. They occur between a certain covering which we call the arachnoid and the brain proper and these hemorrhages occur not too infrequently. Now, the hemorrhages that occur inside the brain, the ordinary stroke, in some cases are affected by the type of work that the person does. It's not common but once in a while, by very excessive strain that a person undergoes, can suddenly develop a hemorrhage on the brain. High blood pressure seems to play a part in those hemorrhages, but the ones that occur around the blood vessels and the base of the brain, which we call the subarachnoid, that is between the arachnoid covering and the brain itself * * * apparently are not affected by anything that the individual does. Neither strain, excessive or otherwise, seems to bring on any hemorrhages of this kind and certainly practically never does it result in hemorrhages from aneurysms."

It is the contention of relator that the work performed by decedent during the day aggravated the condition which resulted in his death and that accordingly she should be permitted to recover under the authorities cited in Gillette v. Harold, Inc. 257 Minn. 313, 101 N. W. (2d) 200. This claim is largely predicated on a statement made by respondents' medical expert to the effect that if he were to prescribe to one suffering from a bleeding aneurysm, he would advise rest. We do not consider this admission fatally inconsistent with the doctor's testimony since it may be assumed that under any circumstances medical judgment would not indicate that one suffering from a bleeding aneurysm should continue to work.

Although there is evidence from which the commission might have reached a contrary result, we are bound by the well-established rule that in reviewing the findings of the Industrial Commission to ascertain whether they are sustained by the evidence all the testimony must

be considered, and when that is done and there is still room for reasonable minds to come to different conclusions, a court of review cannot disturb the findings of the trier of fact. Moreover, the evidence must be considered in the light most favorable to the findings. Kundiger v. Waldorf Paper Products Co. 218 Minn. 168, 15 N. W. (2d) 486; Swanson v. American Hoist & Derrick Co. 214 Minn. 323, 8 N. W. (2d) 24; Sorensen v. P. H. Thompson & Son, 248 Minn. 280, 79 N. W. (2d) 673; Nehring v. Bast, 258 Minn. 193, 103 N. W. (2d) 368, 85 A. L. R. (2d) 1400; Schmoll v. J. W. Craig Co. 228 Minn. 429, 37 N. W. (2d) 539.

Here, we are confronted with a conflict in the testimony as to whether the causation of decedent's death was work-related. We must be controlled by the views expressed on this subject in Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636, and Christenson v. Pedersen Brothers, 269 Minn. 111, 130 N. W. (2d) 234, where we held that the findings of the commission must be sustained.

Affirmed.